STATE OF CONNECTICUT *v.* ANTHONY HOLLOWAY
(13020)

PETERS, C. J., SHEA, CALLAHAN, GLASS and SANTANIELLO, JS.

Argued November 3, 1988—decision released January 24, 1989

*Erskine D. McIntosh,* assistant public defender, with whom, on the brief, were *William Holden,* public defender, and *Victoria Campbell,* legal intern, for the appellant (defendant).

*Richard F. Jacobson,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Jonathan Benedict,* assistant state's attorney, for the appellee (state).

GLASS, J. The principal issue on this appeal is whether the defendant, Anthony Holloway, has established that the state discriminatorily employed a peremptory challenge to exclude a black venireman from the jury that convicted him of the crime of felony murder in violation of General Statutes § 53a-54c.[1] The defendant appeals from the judgment rendered by the trial court as a result of the guilty verdict of the jury.

The jury could reasonably have found the following facts. On July 12, 1985, Roy Lee MacIntyre and his friend, Ernest Reed, were riding in MacIntyre's automobile in Bridgeport. The defendant hitched a ride with MacIntyre to Beardsley Terrace, a public housing project in Bridgeport. At Beardsley Terrace, the defendant was let off on Trumbull Avenue. MacIntyre and Reed continued driving on Trumbull Avenue, turned around and drove back towards the defendant. The defendant requested another ride. This time MacIntyre took him farther down Trumbull Avenue into Beardsley Terrace near building number 16, where MacIntyre stopped the automobile. The defendant pulled a pistol from his pocket, demanded MacIntyre's

---

[1] "[General Statutes] Sec. 53a-54c. FELONY MURDER. A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, sexual assault in the first degree with a firearm, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (A) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (B) was not armed with a deadly weapon, or any dangerous instrument; and (C) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (D) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

car keys and the gold chain that he was wearing. The defendant then shot MacIntyre once in the back of the neck and fled. The autopsy report indicated that MacIntyre died as a result of a single gunshot wound to the back of the neck which caused injury to his cervical spine and brain.

After his trial and conviction of felony murder, the defendant was sentenced to forty-five years imprisonment. On appeal he claims that the trial court erred in: (1) finding that he had failed to establish a prima facie case of purposeful discrimination in the state's use of a peremptory challenge to remove a black venireman; (2) instructing the jury to determine whether prior inconsistent statements properly admitted into evidence as such were indeed inconsistent; (3) instructing the jury as to the limited purpose of prior inconsistent statements; and (4) instructing the jury that flight, if unexplained, tends to prove consciousness of guilt. We conclude that there is no error.

## I

The defendant, who is black, first claims that the trial court violated his federal and state constitutional rights to equal protection in concluding that he had failed to establish a prima facie case of purposeful discrimination in the state's use of a peremptory challenge to remove a black venireman from the jury venire. The panel from which the defendant's jury was selected was composed of fifty-seven venirepersons. Four of the fifty-seven venirepersons were black and three were hispanic. There is no indication that the remaining venirepersons were of any racial minority. In the process of selecting a jury of twelve and two alternates for the defendant's case, the court excused fourteen persons, the state eleven, and the defendant eighteen. The first black person voir dired was accepted by the state and the defendant. The second black person voir

dired was excused by the court because of a prior commitment. The third black person voir dired was Floyd Gaddy. Gaddy was accepted by the defendant, but was peremptorily challenged by the state.[2] The fourth black person voir dired was accepted by the defendant and the state. The defendant's claim is based on the state's removal of Gaddy. It was revealed at oral argument that the victim, MacIntyre, and the state's principal witness were also black.

After considering the arguments of the state and defense counsel concerning the state's use of a peremptory challenge to exclude Gaddy from the venire, the trial court concluded that because there was no pattern in the action of the state, the defendant had failed to present a prima facie case.[3] Specifically, the trial

---

[2] The record discloses that defense counsel posed approximately forty questions to Gaddy. Gaddy, who generally responded with yes or no answers, indicated that he believed he would not be persuaded by the fact that the defendant was black. He also negatively answered the question whether there was any reason why he should not sit on the jury.

The voir dire conducted by the state on Gaddy is as follows:

"Q. How long have you lived up in the Bridgeport area—about?

"A. I've been there about 23 years—24.

"Q. Do you have any children?

"A. No.

"Q. I don't know if you were asked, but as you know, the charge in this case is called felony murder.

"Very basically, what the State is accusing Mr. Holloway of doing is trying to rob the victim and while he was trying to do that, shooting him and killing him.

"Knowing that that's what this case is about, do you think you might have any difficulty being a fair juror on this particular case?

"A. Should not be.

"Mr. Benedict: Your Honor, I have no further questions. Thank you."

[3] The trial court's response in its entirety is as follows: "I'm gathering here, Mr. McIntosh, all you're really saying to me is that the responses of Mr. Gaddy were such that they seemed to be fairly decent responses. It relates to the venireman and because of that, the only reason that the State would have rejected him was because he was black. I really can't really draw that conclusion. Especially when I look to the veniremen that were questioned earlier such as Mr. Rawley and Miss Grundman—as far as the Court's impression of their responses, I thought their responses were quite

court stated: "The Court sees no pattern at this stage of the proceeding that that would be the situation on the part of the State. I think you do have to set up a prima facie case and what you just indicated alone does not set a prima facie case. I will not require the State to make any neutral explanation of its peremptory challenge."

Relying on *Batson* v. *Kentucky,* 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), the defendant argues that the trial court erred in using the standard of *Swain* v. *Alabama,* 380 U.S. 202, 85 S. Ct. 824, 13 L. Ed. 2d 759 (1965), in evaluating the defendant's claim that the state had used a peremptory challenge based on purposeful racial discrimination to exclude Gaddy from the defendant's venire. Under *Swain* v. *Alabama,* supra, a defendant was required to "prove a systematic exclusion of members of a racial group from the petit jury to establish a constitutional violation. *Batson* modifies this burden of proof. A defendant is no longer required to prove that the peremptory challenges are being exercised to deny equal protection in 'case after case' . . . . " *State* v. *Gonzalez,* 206 Conn. 391, 394–95, 538 A.2d 210 (1988).

*Batson* established the guidelines for evaluating a criminal defendant's claim that the state's exercise of a peremptory challenge was based on purposeful racial discrimination. *State* v. *Gonzalez,* supra, 395. Procedurally, the defendant bears the burden of persuading

---

decent. Of course, they were white and they were rejected. So I can't automatically assume that because Mr. Gaddy's responses were relatively, for lack of a better word, decent as we would expect a venireman to respond that I have to determine that the peremptory challenge was because of race only. The Court sees no pattern at this stage of the proceeding that that would be the situation on the part of the State. I think you do have to set up a prima facie case and what you just indicated alone does not set a prima facie case.

"I will not require the State to make any neutral explanation of its peremptory challenge."

the trial court by a preponderance of evidence that the state's use of the peremptory challenge was tainted by purposeful racial discrimination. *Batson* v. *Kentucky, supra,* 94 n.18. Once the defendant has established a prima facie case of purposeful racial discrimination, the burden shifts to the state to advance a neutral explanation for the venireperson's removal. Id., 97. The defendant is then afforded the opportunity to demonstrate that the state's articulated reasons are insufficient or pretextual. " 'Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility'; [*Batson* v. *Kentucky, supra,* 98 n.21]; a trial court's determination that there has or has not been intentional discrimination is 'entitled to appropriate deference' upon review on appeal. Id." *State* v. *Gonzalez, supra.*

*Batson* set forth the following standard for establishing claims of racially motivated peremptory challenges. "[T]he defendant first must show that he is a member of a cognizable racial group . . . and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' . . . Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empanelling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination." *Batson* v. *Kentucky, supra,* 96.

The *Batson* court indicated that "[i]n deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circum-

stances. For example, a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose." Id., 96–97. The court, however, indicated that these examples were illustrative only, and declined to establish a complete list of factors relevant to determining whether an inference of purposeful discrimination has been raised. Id., 97.

We first note that the trial court's analysis of whether the defendant had established a prima facie claim did not fully comport with the plenary consideration of relevant facts and circumstances contemplated by *Batson.* The trial court concluded that it perceived "no pattern at this stage of the proceeding" to indicate purposeful racial discrimination. As we noted in *State* v. *Gonzalez,* supra, 400, "the striking of even one juror on the basis of race violates the equal protection clause, even when other jurors of the defendant's race were seated . . . . " Thus, although a lack of evidence of a "pattern" of striking venirepersons of the defendant's race is one factor, that factor is not dispositive. *Batson* v. *Kentucky,* supra. The relevant circumstances may indicate purposeful racial discrimination where any one venireperson of the defendant's race has been removed. *State* v. *Gonzalez,* supra.

Despite the trial court's incomplete consideration of the circumstances, we conclude that it was correct in determining that the defendant had failed to establish a prima facie case. See *Favorite* v. *Miller,* 176 Conn. 310, 317, 407 A.2d 974 (1978). In *State* v. *Gonzalez,* supra, we identified several factors relevant to the question of whether the state's explanation of its use of a peremptory challenge was neutral. Many of these factors are equally relevant to the prior determination of

whether the defendant has established a prima facie case. These include (1) whether "the prosecutor failed to question the challenged juror or only questioned him or her in a perfunctory manner"; id., 399; (2) whether "prospective jurors of one race were asked a question to elicit a particular response that was not asked of the other jurors"; id.; (3) whether "persons with the same or similar characteristics but not the same race as the challenged juror were not struck"; id.; and (4) whether "the prosecutor used a disproportionate number of peremptory challenges to exclude members of one race." Id.

The defendant asserts that the state's desultory, three question voir dire of Gaddy when combined with the fact of Gaddy's removal was sufficient to raise an inference of purposeful racial discrimination. We disagree.

The state's manner of conducting the voir dire of the challenged venireman is one factor to consider in determining whether an inference of purposeful discrimination has been raised. See *Batson* v. *Kentucky,* supra; *People* v. *Turner,* 42 Cal. 3d 711, 727, 726 P.2d 102, 230 Cal. Rptr. 656 (1986). In view of all the circumstances relevant to the defendant's claim in the present case, however, we are not persuaded that the state's voir dire of Gaddy raised an inference of purposeful discrimination. The record reflects that the state asked Gaddy how long he had lived in Bridgeport, whether he had any children, and whether he would have any difficulty in being fair. To this last question, Gaddy responded, "[s]hould not be." The record also shows that defense counsel posed some forty questions to Gaddy, most of which received one word responses. The voir dire between defense counsel and Gaddy, of course, was grist for the state's consideration in deciding whether to exercise a peremptory challenge. See *Lockett* v. *State,* 517 So. 2d 1346, 1353 (Miss. 1987).

The transcript also indicates that the state asked the same number or fewer questions of eight other venirepersons, none of whom was black.

There were other factors tending to militate against an inference of purposeful racial discrimination. Although we have held that the trial court should not have relied solely on the absence of a "pattern," the court was correct in noting that there had been no pattern of excluding black venirepersons by the state. Of the two black persons voir dired before Gaddy, the state accepted one and the other was excused by the court. Further, the fact that the state accepted another black venireperson after its peremptory challenge of Gaddy suggests a lack of purposeful racial discrimination.

The principles of *Batson* make clear that a true evaluation of a claim of purposeful racial discrimination cannot turn on a statistical comparison of the number of venirepersons of the defendant's race that the state accepts and the number it rejects. These figures are nonetheless relevant. In the present case, discounting the number of venirepersons excused by the court, the remaining black persons on the venire constituted 7 percent of the venire. Two of the twelve jurors, or 17 percent, who sat on the trial were black. Although it is entirely possible that, in some instances, the state's use of peremptory challenges to remove black persons may be racially motivated despite the fact that black persons represent a greater proportion on the petit jury than the venire from which they were chosen, we are not persuaded that this is the situation in the present case.

We conclude that, on the record before us, the defendant did not establish by a preponderance of the evidence that the state's use of a peremptory challenge to remove Gaddy from the venire was racially motivated. The trial court's conclusion was, therefore, not

erroneous. Our decision today is consistent with the decisions of several other courts that have considered similar *Batson* claims. See, e.g., *United States* v. *Ingram,* 839 F.2d 1327, 1329–30 (8th Cir. 1988) (state's striking of one of two black persons from venire of thirty-five insufficient to raise inference of racial discrimination); *United States* v. *Porter,* 831 F.2d 760, 767 (8th Cir. 1987), cert. denied, U.S. , 108 S. Ct. 1037, 98 L. Ed. 2d 1001 (1988) (prima facie *Batson* case not established where government removed one of two black persons from venire but accepted other); *United States* v. *Dennis,* 804 F.2d 1208, 1210–11 (11th Cir. 1986) (per curiam), cert. denied, 481 U.S. 1037, 107 S. Ct. 1973, 95 L. Ed. 2d 814 (1987) (removal of three of five black venirepersons did not establish prima facie *Batson* case where state accepted two other black venirepersons); cf. *United States* v. *Battle,* 836 F.2d 1084, 1085–86 (8th Cir. 1987) (prima facie case established where five of seven black venirepersons removed); *Oliver* v. *State,* 526 So. 2d 892, 893 (Ala. Crim. App. 1987) (state's use of six peremptory challenges to strike black venirepersons, leaving only one black person on petit jury, established prima facie case).

Despite our conclusion in the present case, we emphasize that the issue of purposeful racial discrimination in the state's use of peremptory jury challenges is a matter of "utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." *State* v. *Gonzalez,* supra, 394. The issue of purposeful racial discrimination in the use of peremptory challenges by the state may arise in any jury trial of a criminal case in which venirepersons of the same cognizable racial group as the defendant are struck from the venire. Consequently, because this issue is of such vital importance to our real and perceived adherence to the rule of law, in the exercise of our inherent supervisory authority

over the administration of justice, in all future cases in which the defendant asserts a *Batson* claim, we deem it appropriate for the state to provide the court with a prima facie case response consistent with the explanatory mandate of *Batson*.[4] Such a response will not only provide an adequate record for appellate review but also aid in expediting any appeal.

## II

Next, the defendant claims that the trial court erred in instructing the jury to determine whether certain prior inconsistent statements, admitted into evidence as such, were indeed inconsistent. He also claims that the trial court's charge denied him the full utility of the prior inconsistent statements as a proper impeachment device against the state's primary witness. Although the trial court did not give the defendant's requested instructions to the jury, the defendant never objected or took exception to the instructions given by the court as required by Practice Book § 852.[5] He now

---

[4] We note with approval the following language of the Supreme Court of South Carolina. "Rather than deciding on a case by case basis whether the defendant is entitled to a hearing based upon a *prima facie* showing of purposeful discrimination under the vague guidelines set forth by the United States Supreme Court, the better course to follow would be to hold a *Batson* hearing on the defendant's request whenever the defendant is a member of a cognizable racial group and the prosecutor exercises peremptory challenges to remove members of defendant's race from the venire. This bright line test would ensure consistency by removing any doubt about when a *Batson* hearing should be conducted. Further, this procedure would ensure a complete record for appellate review.

"In all future jury trials, therefore, we recommend that the trial court hold a *Batson* hearing whenever 1) the defendant requests such a hearing; 2) the defendant is a member of a cognizable racial group; *and* 3) the prosecutor exercises peremptory challenges to remove members of defendant's race from the venire." (Emphasis in original.) *State* v. *Jones*, 293 S.C. 54, 57–58, 358 S.E.2d 701 (1987); *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

[5] Practice Book § 852 provides: "The supreme court shall not be bound to consider error as to the giving of, or the failure to give, an instruction unless the matter is covered by a written request to charge or exception

seeks review of the trial court's action, claiming that the issue was properly preserved because he filed a written request to charge on prior inconsistent statements.[6] We disagree.

The defendant's request to charge did not encompass the question whether the jury could independently evaluate the inconsistency of the statements after they had been admitted into evidence. Consequently, the matter the defendant now objects to was not covered by the written request to charge. Practice Book § 852. We also disagree with the defendant's argument that review under *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973), is appropriate because the trial court's action deprived him of his rights under the sixth amendment to the federal constitution and article first, § 8, of the Connecticut constitution to confront the wit-

has been taken by the party appealing immediately after the charge is delivered. Counsel taking the exception shall state distinctly the matter objected to and the ground of objection. Upon request, opportunity shall be given to present the exception out of the hearing of the jury."

[6] The pertinent written request for instruction by the defendant was as follows: "The testimony of a witness may be discredited or impeached by showing that he previously made statements which are inconsistent with this trial testimony. Such prior inconsistent statements do constitute evidence and are admissible to impeach, that is to call into question, the credibility of the witness. It is the province of the jury to determine the credibility, if any, to be given the testimony of a witness who has been so impeached. Devitt and Blackmar, 1 Federal Jury Practice and Instruction, pp. 540, 562 §§ 17.08, 1716 (West 3rd Ed. 1977), *California* v. *Green,* 399 U.S. 149, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970). See, Tait and LaPlante, Handbook of Connecticut Evidence, 183–84, (Little, Brown and Co. 1976)."

The pertinent instruction on inconsistent statements given by the trial court is as follows: "The fact that they have been labeled inconsistent statements is not a direction to you that they must be accepted by you as being inconsistent with in court testimony. It is for you as jurors to determine if any one or all of the claimed inconsistencies were in fact inconsistent, and if they were inconsistent, to what degree they were inconsistent. That is, whether the inconsistency was material or not material to the issues in the case. And of course, the witness had the opportunity to explain any claimed inconsistencies, and you would have the right to evaluate such explanation or lack of explanation."

nesses against him. The defendant cites no case law to support his theory that an instruction that the jury may consider whether the statements were inconsistent implicates his sixth amendment right to confront the witnesses against him. Cf. *State* v. *Ghere,* 201 Conn. 289, 301 n.9, 513 A.2d 1226 (1986) (rejecting claim that impeachment of credibility of alibi witnesses implicates sixth amendment right to present defense); see also *State* v. *Stepney,* 191 Conn. 233, 246–49, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772, reh. denied, 466 U.S. 954, 104 S. Ct. 2163, 80 L. Ed. 2d 547 (1984) (upholding instructions that allowed jury to consider whether statements of defense witness were in fact inconsistent); *State* v. *Villafane,* 171 Conn. 644, 673, 372 A.2d 82 (1976), cert. denied, 429 U.S. 1106, 97 S. Ct. 1137, 51 L. Ed. 2d 558 (1977) (charge that jury could consider whether defense witness' testimony was inconsistent with prior statements was correct in law). "Putting a constitutional tag on a nonconstitutional claim will no more change its essential character than calling a bull a cow will change its gender. . . . [T]he *Evans* trial court bypass to this court is a narrow constitutional path and not the appellate Champs-Elysees." *State* v. *Gooch,* 186 Conn. 17, 18, 438 A.2d 867 (1982). "Because the sixth amendment claim was not distinctly raised below and because the record does not adequately support a claim that the defendant was clearly deprived of a fundamental right and a fair trial, we do not review its merits." *State* v. *Ghere,* supra, 301 n.9.

## III

The defendant also claims that the trial court erred in its charge to the jury as to the limited purpose of oral prior inconsistent statements.[7] The defendant

[7] The trial court's pertinent instruction on the limited purpose of prior inconsistent statements is as follows: "In any event, the claimed inconsistent statements in this case made out-of-court were admitted by the Court as

argues that in *State* v. *Whelan,* 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), this court allowed the substantive use of sworn prior inconsistent statements. "For many years Connecticut followed the common-law rule; namely, prior inconsistent statements were inadmissible hearsay when offered for substantive purposes. In 1986 Connecticut altered its rule to admit certain prior inconsistent statements if given under 'prescribed circumstances reasonably assuring reliability.' [Id., 752]. Rather than adopt a rule admitting all such statements, however, [*Whelan*] restricted the new exception to 'prior *written* inconsistent statements *signed* by the declarant who has *personal knowledge* of the facts stated, when the declarant *testifies* at trial and is subject to *cross-examination.*' Id. at 753. Prior tape recorded statements also satisfy the exception. Id. at 754 n.9; see also *State* v. *Cascone,* 10 Conn. App. 163, 165 n.1, 521 A.2d 1067 (1987)." (Emphasis in original.) C. Tait & J. LaPlante, Connecticut Evidence (2d Ed.) § 7.24.3 (c), p. 210.

The defendant did not submit any written request for instructions on this issue, nor did he object or take exception to the charge as given by the trial court as required by Practice Book § 852. He now seeks to expand *Whelan* to include the substantive use of prior inconsistent oral statements. There is no indication that any of the prior inconsistent statements admitted in evidence in this case were "prior written inconsistent statements, signed by the declarant." *State* v. *Whelan,* supra, 753. We do not discern the *Whelan* change allow-

evidence for a limited purpose only. They were admitted only for the purpose of impeaching the credibility of the witness, Ernest Lee Reed. In other words, you may use that evidence of inconsistent statements to determine what credit you will attach to the overall testimony of Ernest Lee Reed. They were not allowed in evidence for the truth of the matter contained in the out-of-court statement or testimony, but only for the purpose of impeachment of the witness's credibility."

ing the substantive consideration of prior inconsistent statements to be a change of constitutional dimension. Accordingly, since the defendant has failed to comply with the procedures established for preserving review of his claim, we decline to review it. Practice Book § 852.

## IV

Finally, the defendant claims that the trial court's instructions to the jury that flight, if unexplained, tends to prove consciousness of guilt violated the defendant's right not to present evidence at a criminal trial as guaranteed by the federal and state constitutions as well as General Statutes § 54-84 (b).[8] The trial court instructed the jury that "the conduct of a person leaving the scene of an incident may be considered in determining his guilt, since, if unexplained, it tends to prove a consciousness of guilt. Now, flight by the accused after a crime has been committed does not create a presumption of guilt. You may consider evidence of flight, however, as tending to prove the defendant's consciousness of guilt. You are not, however, required to do so. You should consider and weigh the evidence of flight by the accused in connection with all the other evidence in the case and give it such weight as in your sound judgment it is fairly entitled to receive." Again, the defendant concedes that he neither requested an instruction on the subject of flight nor objected or excepted to the charge as given. Nonetheless, he argues that this claim is reviewable because § 54-84 (b) is a statute of constitutional dimension which embraces a fundamental right. *State* v. *Tatem,* 194 Conn. 594, 483 A.2d 1087 (1984); *State* v. *Evans,* supra.

[8] "General Statutes § 54-84 (b) provides: "Unless the accused requests otherwise, the court shall instruct the jury that they may draw no unfavorable inferences from the accused's failure to testify. In cases tried to the court, no unfavorable inferences shall be drawn by the court from the accused's silence.""

Under § 54-84 (b), the defendant has a right not to testify at his trial, and unless he requests otherwise, the trial court must instruct the jury that it may draw no unfavorable inferences from his failure to testify. *State* v. *Tatem,* supra, 597. The defendant argues that the "flight, when unexplained" passage in the jury instructions unconstitutionally shifted the burdens of both production and persuasion, thereby violating the defendant's right not to testify guaranteed by the fifth amendment to the federal constitution, and article first, § 8, of the constitution of Connecticut and § 54-84 (b). We are not persuaded. Section 54-84 (b) does not purport to insulate the defendant from the consequences of failing to explain through his own testimony or otherwise his conduct in leaving the scene of the crime for which he is charged. That statute recognizes only a defendant's right not to testify, and at his election, to have the jury instructed that they may not draw any unfavorable inference against him for exercising that right. " 'We need not close our eyes to the fact that every person accused of crime is under some pressure to testify, lest the jury, despite carefully framed instructions, draw an *unfavorable* inference from his silence.' (Emphasis added.) *Raffel* v. *United States,* 271 U.S. 494, 499, 46 S. Ct. 566, 70 L. Ed. 1054 (1926)." *State* v. *Tatem,* supra, 600; see also *Carter* v. *Kentucky,* 450 U.S. 288, 303, 101 S. Ct. 1112, 67 L. Ed. 2d 241 (1981).

The flight instruction given by the trial court is consistent with our case law. We have stated: " 'Flight, when unexplained, tends to prove a consciousness of guilt.' *State* v. *Ferrara,* 176 Conn. 508, 516, 408 A.2d 265 (1979). 'Flight is a form of circumstantial evidence. Generally speaking, all that is required is that the evidence have relevance, and the fact that ambiguities or explanations may exist which tend to rebut an inference of guilt does not render evidence of flight inadmissible but simply constitutes a factor for the jury's

consideration.' *State* v. *Piskorski,* 177 Conn. 677, 723, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979). 'The probative value of evidence of flight depends upon all the facts and circumstances and is a question of fact for the jury.' " *State* v. *Wright,* 198 Conn. 273, 281, 502 A.2d 911 (1986); *State* v. *Jones,* 205 Conn. 723, 731, 535 A.2d 808 (1988); *State* v. *Piskorski,* supra, 723; *State* v. *Ferrara,* supra, 516–18; *State* v. *Rosa,* 170 Conn. 417, 432–33, 365 A.2d 1135, cert. denied, 429 U.S. 845, 97 S. Ct. 126, 50 L. Ed. 2d 116 (1976). We conclude that the flight instructions of the trial court did not violate any constitutional or statutory right of the defendant.

There is no error.

In this opinion the other justices concurred.