## STATE OF CONNECTICUT *v.* MIGUEL M. BELTRAN
### (SC 15635)

Borden, Berdon, Norcott, Katz and Palmer, Js.

Argued May 28—officially released August 11, 1998

*Elizabeth M. Inkster*, assistant public defender, for the appellant (defendant).

*Frederick W. Fawcett*, assistant state's attorney, with whom, on the brief, was *Jonathan C. Benedict*, state's attorney, for the appellee (state).

*Opinion*

BORDEN, J. The defendant appeals[1] from the judgment of conviction, after a jury trial, of one count of capital felony in violation of General Statutes § 53a-54b (8).[2] The defendant claims that: (1) the trial court's instructions on self-defense were flawed; and (2) he was deprived of his state and federal constitutional rights to equal protection of the laws because the trial court improperly sustained the state's peremptory challenge to a Hispanic venireperson. We affirm the judgment.

---

[1] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b), which provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony . . . ."

[2] General Statutes § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of . . . (8) murder of two or more persons at the same time or in the course of a single transaction . . . ."

The defendant also had been charged with two counts of murder in violation of General Statutes § 53a-54a (a), which provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

The jury reasonably could have found the following facts. The defendant, Miguel M. Beltran, a fifty-five year old married man, had been involved romantically with one of the victims, thirty-three year old Lucy Torres (Torres), for approximately three years. Prior to September 29, 1995, Torres had ended her relationship with the defendant, and at that time she was dating the other victim, Wilfredo M. Reyes. The defendant repeatedly had attempted but failed to resume his relationship with Torres. Within the two week period between their break-up and September 29, 1995, the defendant called Gloria Rivera, Torres' friend, several times each day asking Rivera to help him mend his relationship with Torres. The defendant told Rivera that he would kill Torres if she did not resume their relationship in two weeks. Early in the evening of September 29, 1995, the defendant told Jose Torres, the victim's brother, that he had given her two weeks, and the two weeks were up. On that same day, the defendant telephoned Torres several times, but she declined to speak with him. Instead, Adaliz Cintron, who was living with Torres at the time, spoke with the defendant, and he told Cintron that he had written a letter explaining why he would kill Torres.

Later that night, Torres, Jose Torres, Cintron, Rivera and Reyes were gathered at the Spanish-American Family Center, a social club located in Bridgeport. Between 10:15 and 10:45 p.m., the defendant arrived at the club. He had not been to the club for approximately one year. While at the club, the defendant told Gilberto Garcia, the proprietor of the club, that he had decided to do what he had vowed to do and he pointed at Torres. On his way out, the defendant passed by the victims' table, which was located near the club's exit, and told Reyes that he wanted to see him outside. Reyes, accompanied by Torres, followed the defendant outside. Approximately twenty seconds later, four closely-spaced gun

shots were heard. Jose Torres, Rivera and Cintron went outside, where they saw the defendant standing behind his car taking the bullet casings out of a gun that he was holding and putting them into his pocket. All three individuals saw the defendant get in his car and drive away.

Jose Torres, Rivera and Cintron then saw Reyes and Torres lying on the ground motionless and bleeding. The defendant had shot Torres twice. One bullet had entered the palm of Torres' right hand and exited from its back. The other bullet initially had penetrated her left rib cage, pierced her left lung, abraded her heart, fractured a thoracic vertebrae, and passed through the lower part of her right lung before exiting her body three inches above its point of entry. This bullet killed Torres.

The defendant also had shot Reyes twice. One bullet had grazed Reyes' right arm, and the other, the fatal bullet, had entered his right buttock, passed through his pelvic bone and the pelvic area damaging an artery, traveled through the bladder, penetrated the opposite side of the pelvic bone, injured another artery, and finally exited his body from the groin area. Reyes bled to death.

Both victims had been shot by a high-powered weapon at close range. Although the police did not find a weapon or any empty bullet casings at the scene of the crime, they did find an empty case for a .44 caliber handgun and .44 caliber ammunition at the defendant's house. Forensic tests performed on the defendant's hands and clothing indicated that he recently had fired a gun, while tests on Reyes' hands conclusively indicated that he had not fired a gun.

At the defendant's trial, he claimed self-defense,[3] and offered the jury the following evidence to support his

---

[3] General Statutes § 53a-19 (a) provides: "Except as provided in subsections (b) and (c) of this section, a person is justified in using reasonable

claim.[4] Reyes and the defendant had exchanged words while the defendant was leaving the club. Reyes and Torres followed the defendant outside, where Reyes verbally threatened and insulted the defendant while keeping his hand behind his back as if Reyes was concealing a weapon. While maintaining this posture, Reyes approached the defendant and slapped him. The defendant reacted by grabbing Reyes' right hand, in which Reyes was holding a gun, and a struggle over the gun ensued. While Torres was attempting to separate the two by positioning herself between them, the gun accidentally discharged four shots. According to the defendant, he left the gun at the scene and drove away only because he thought Torres' friends and family might attempt to kill him. The defendant speculated that no gun was found at the scene because it had been picked up by one of the bystanders before the arrival of the police.

The trial court instructed the jury on the defense of self-defense. The jury found the defendant guilty of two counts of murder and one count of capital felony as charged in the information. The trial court merged the two murder counts with the capital felony count, and rendered a judgment of conviction accordingly. This appeal followed.

## I

The defendant raises two challenges to the trial court's instructions on self-defense, namely, that the

physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm."

[4] The defendant also claimed severe emotional distress as an affirmative defense to the crime of murder pursuant to General Statutes § 53a-54a (a).

trial court improperly failed to instruct the jury on: (1) mistake of fact as requested by the defendant; and (2) the initial aggressor doctrine. We reject both of these claims.

## A

The defendant first claims that the trial court improperly omitted instructions on the defense of mistake of fact from its charge to the jury.[5] We reject this claim because the evidence in this case did not require a specific mistake of fact instruction.

The defense of mistake of fact is available under General Statutes § 53a-6 (a), which provides in relevant part: "A person shall not be relieved of criminal liability for conduct because he engages in such conduct under a mistaken belief of fact, unless: (1) Such factual mistake negates the mental state required for the commission of an offense . . . or (3) such factual mistake is of a kind that supports a defense of justification." A mistake

See footnote 2 of this opinion. He does not raise on appeal, however, any claim regarding that affirmative defense.

[5] The defendant filed a written request to charge on mistake of fact, which included the following: "The language of our self-defense statute presents a question of fact about what the defendant himself reasonably believed about his exposure to jeopardy under the circumstances. It focuses on the person claiming self-defense. The jury must view the circumstances which the defendant claims justified the use of force from the perspective of the defendant and then determine whether his belief was reasonable. In determining the reasonableness of his beliefs as to the necessity for the use of force and the degree of force necessary, the jury should consider his perceptions concerning both the physical circumstances requiring the use of force and his familiarity of the deceased and the deceased's earlier violent behavior against him. Even *if the defendant was mistaken in his belief* regarding the necessity of using force, if his belief was reasonable, then his actions were justified." (Emphasis added.)

In all respects, the trial court's instructions were substantially the same as what was requested by the defendant, except that the trial court omitted that portion of the request referring to the defendant's mistaken belief. In light of the defendant's written request, the defendant's claim was properly preserved for review under Practice Book § 42-16.

of fact exists "when one makes an erroneous perception of the facts as they actually exist. . . . The defense arises only where the defendant misperceives an objective state of existing fact . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Silveira*, 198 Conn. 454, 460–61, 503 A.2d 599 (1986). An instruction on mistake of fact is required "only when evidence supporting [this] . . . defense is placed before the jury." (Internal quotation marks omitted.) Id., 462; see also *State* v. *Fuller*, 199 Conn. 273, 278, 506 A.2d 556 (1986). "The court . . . has a duty not to submit to the jury, in its charge, any issue upon which the evidence would not reasonably support a finding." *State* v. *Diggs*, 219 Conn. 295, 299, 592 A.2d 949 (1991). No mistake of fact instruction was required in the present case because there was no evidence showing that the defendant acted under any mistaken belief of fact.

In this case, the state argued to the jury that the defendant, acting out of jealousy and rage, executed his plan to shoot and kill Reyes and Torres. On the other hand, the defendant contended that he had been threatened by Reyes, forcing the defendant to defend himself. According to the defendant, Reyes not only had assumed a posture of attack by threatening and insulting the defendant while aggressively advancing toward the defendant with his hand behind his back, but Reyes actually drew a gun to attack the defendant. The defendant maintained throughout the trial that because of Reyes' attack, which resulted in a struggle over the gun, the victims were accidentally shot. He did not testify nor was there any other evidence showing that he later found his perception of these events to be incorrect. Hence, there was no evidence tending to show a factual mistake on the part of the defendant's comprehension of the circumstances to be tested by the jury. Therefore, an instruction regarding a mistake of fact was unwarranted.

## B

The defendant's second challenge to the self-defense instruction is that the trial court improperly failed to instruct the jury on the initial aggressor doctrine. This claim, which the defendant raises under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), is unavailing.[6]

Under *Golding*, the defendant may prevail if: (1) the record is adequate for reviewing the alleged error; (2) the alleged error is of a constitutional dimension; (3) the defendant's alleged constitutional claim clearly exists and clearly deprived him of a fair trial; and (4) the error was not harmless. Id., 239–40. The first two steps in the *Golding* analysis address the reviewability of the claim, while the last two steps involve the merits of the claim.

We agree with the defendant that the record is adequate for a determination of whether the instruction, as given by the court, comported with the law. We also

[6] The defendant did not preserve this claim for review. The defendant's written request to charge included the following: "*(If instructions on [General Statutes] § 53a-19 [c] [2] are given)* The use of words which cause a confrontation does not make someone the initial aggressor and thereby render self-defense unavailable. In other words, it is not necessary for the defendant to have been totally without fault or blame in this incident to avail himself of the doctrine of self-defense." (Emphasis added.)

Section 53a-19 (c) (2), which was referred to by the defendant in his request, embodies the initial aggressor doctrine and its legal effect on a self-defense claim. The defendant's request demonstrates that an instruction defining who is *not* an initial aggressor would have been necessary only *if* an instruction on who *is* an initial aggressor were to be given by the court. Because the court did not instruct the jury on the initial aggressor doctrine, the court was free not to consider the defendant's request. By making a conditional request, the defendant effectively failed to make an affirmative written request to have the jury charged on the scope of the initial aggressor doctrine. Indeed, if anything, the defendant's request to charge would have indicated to the trial court that the defendant did not consider an instruction on the initial aggressor doctrine necessary to the case. Therefore, the defendant's claimed error was not properly preserved at trial, and the defendant may prevail, if at all, only under the rule of *Golding*.

agree that an instruction that omits an element of a defense is constitutionally inadequate. *State* v. *Corchado*, 188 Conn. 653, 660, 453 A.2d 427 (1982). We conclude, however, that the defendant's claim fails because the trial court's failure to instruct the jury on the initial aggressor doctrine was not improper.

General Statutes § 53a-19 (c), which embodies the initial aggressor doctrine, provides in relevant part: "Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using physical force when . . . (2) he is the initial aggressor . . . ." Subsection (a) of § 53a-19 provides the legal standard under which a defendant may establish self-defense. Subsection (a), however, is subject to subsection (c), because it provides: "*Except as provided in subsections (b) and (c) of this section*, a person is justified in using reasonable physical force upon another person to defend himself . . . ." (Emphasis added.) General Statutes § 53a-19 (a).

Both subsection (a) and (c) of § 53a-19 (a), therefore, demonstrate that one is *not* entitled to the defense of self-defense if subdivision (2) of subsection (c) is proven. Put another way, the defendant is not entitled to avail himself of the defense of self-defense if he is the initial aggressor. Essentially, therefore, the concept of initial aggressor is a limitation on what would otherwise be a valid defense of the justified use of force in self-defense.

In the present case, the state did not claim that the defendant was the initial aggressor. Therefore, the defendant's self-defense claim was not exposed to the possibility of being undermined by § 53a-19 (c) (2). Because there had been no attempt by the state to defeat the defendant's self-defense claim by using the initial aggressor doctrine, there was no occasion for the trial court to instruct the jury on that doctrine. We

fail to see, therefore, how the defendant can complain about the omission of an instruction on a doctrine that only would have harmed him had it been given to the jury.

The question for the jury in this case was whether the defendant shot and killed Reyes and Torres in cold blood out of rage and jealousy, or whether the defendant, in the course of a hand-to-hand struggle with Reyes over the gun, accidentally shot and killed the victims. Whether the defendant was the initial aggressor simply was not an issue in this case. Thus, an instruction on § 53a-19 (c) (2) could only have confused the jury and ultimately harmed the defendant.

## II

The defendant's final claim is that the trial court violated his federal and state constitutional[7] rights to the equal protection of the laws in concluding that the state's race-neutral explanation for exercising a peremptory challenge was satisfactory. The defendant bases his claims on the following facts.

During the jury selection, the state used a peremptory challenge to remove a young Hispanic woman, Estella Rodriguez, from the venire panel. The defendant objected to the state's peremptory challenge, and the trial court asked the state to provide its reasons for the peremptory challenge. The assistant state's attorney stated: "She's nineteen years old; she just graduated from high school. She's unmarried. Particularly her age but . . . if you look at everybody who has been selected so far in this case they all are on some sort of a career track. Almost everybody is married, has children, etc. I don't believe that this person has had

---

[7] "Because the defendant has failed to provide any independent analysis under the state constitution, we limit our review to the federal constitution." *State* v. *Porter*, 241 Conn. 57, 133 n.77, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998).

enough exposure to society to, in my opinion, sit on a murder case." The trial court found that these reasons were race-neutral. The defendant did not respond in any way, and the venireperson was excused.

On appeal, the defendant claims that the state's explanations for using its peremptory challenge were pretexts to camouflage what was in reality a racially biased challenge in violation of the equal protection clause under *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), and *State* v. *Holloway*, 209 Conn. 636, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989). We disagree.

In *Batson*, the United States Supreme Court set forth the guidelines for assessing a defendant's claim of purposeful, race-based peremptory challenges by the state. *Batson* v. *Kentucky*, supra, 476 U.S. 96–98. Procedurally, the facts necessary to prove the state's racially discriminatory purpose under the *Batson* test are propounded by the parties through a three step process. First, the defendant must establish a prima facie case of purposeful racial discrimination by the state. Id., 96–97. The burden then shifts to the state to propound a race-neutral purpose for seeking the removal of the venireperson. Id., 97–98. Last, the defendant may then demonstrate that the state's reasons are pretextual or insufficient. Id. "The defendant carries the ultimate burden of persuading the trial court, by a preponderance of the evidence, that the jury selection process in his or her particular case was tainted by purposeful discrimination." *State* v. *Gonzalez*, 206 Conn. 391, 395, 538 A.2d 210 (1988).

In *Holloway*, we held that in order to establish a prima facie case of purposeful, racially motivated jury selection by the state, it is only necessary for the defendant to show that he or she is "a member of a cognizable racial group and [that] the prosecutor exercise[d]

peremptory challenges to remove members of [the] defendant's race from the venire." (Internal quotation marks omitted.) *State* v. *Holloway,* supra, 209 Conn. 646 n.4. Because the record establishes that both the defendant and the venireperson were Hispanic, a cognizable racial group; see, e.g., *United States* v. *Rioux,* 97 F.3d 648, 654 (2d Cir. 1996); we conclude that the first step of the *Batson-Holloway* test was met.

After a prima facie case of a purposeful, racially biased peremptory challenge is established, the state must "articulate a neutral explanation related to the particular case to be tried" for attempting to remove the venireperson. *Batson* v. *Kentucky,* supra, 476 U.S. 98. The state, in the present case, provided its reasons, and the trial court found that the state had provided a valid, race-neutral explanation for using its peremptory challenge to remove Rodriguez from the venire panel. The record supports the trial court's finding.

To satisfy the second part of the *Batson-Holloway* test, the nature of the state's reason must be race-neutral, meaning that it must not be motivated by a racially biased assumption; id., 97–98; and the state's reasons must be related to the case. Id., 98. A plurality of the United States Supreme Court has stated that "[a] neutral explanation in [this] context . . . means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez* v. *New York,* 500 U.S. 352, 360, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991) (Rehnquist, C. J., and Kennedy, White and Souter, Js.). Generally, an explanation based on something other than the race of the juror is neutral in this context. Id., 374 (O'Connor and Scalia,

Js., concurring). Because age, level of education, profession or marital status are not intrinsically racial characteristics, the trial court was justified in finding the state's explanation to be facially race-neutral.

In addition, the state's reasons bore a rational relation to the case. This connection is established as long as the record "adequately substantiate[s]" legitimate reasons for exercising a peremptory challenge. *State* v. *Gonzalez*, supra, 206 Conn. 405. In the present case, the state's general contention was that Rodriguez had not "had enough exposure to society to . . . sit on a murder case." The venireperson in this case was an unmarried, nineteen year old, recent high school graduate. These facts reasonably supported the state's expressed concerns regarding her competence to serve as a juror in a double murder case.

Once the state met its burden of producing a race-neutral explanation, it was incumbent upon the defendant to persuade the trial court that the state's reasons were insufficient or pretextual. To have done so, the defendant could have advanced reasons "that are salient to a showing of pretext."[8] *State* v. *Gonzalez*, supra, 206 Conn. 399. The defendant, however, made no effort to carry his burden under the third step of the *Batson-Holloway* test. Therefore, the only inference that the trial court could have drawn was that the defendant accepted the state's explanation.

---

[8] In *State* v. *Gonzalez*, supra, 206 Conn. 399, we compiled a nonexhaustive list of such evidence, which included: "(1) The reasons given for the challenge were not related to the trial of the case . . . (2) the prosecutor failed to question the challenged juror or only questioned him or her in a perfunctory manner . . . (3) prospective jurors of one race were asked a question to elicit a particular response that was not asked of the other jurors . . . (4) persons with the same or similar characteristics but not the same race as the challenged juror were not struck . . . (5) the prosecutor advanced an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically . . . and (6) the prosecutor used a disproportionate number of peremptory challenges to exclude members of one race." (Citations omitted; internal quotation marks omitted.)

On appeal, however, the defendant argues that the trial court, after having requested and received a valid race-neutral explanation from the state, and after the defendant made no effort to challenge that explanation, had a sua sponte duty to do something more before excusing the venireperson. The defendant offers no authority or reason for such an unorthodox application of the *Batson-Holloway* test, and we decline to fashion one in the present case.

The judgment is affirmed.

In this opinion the other justices concurred.