## STATE OF CONNECTICUT *v.* ROY JONES
## (9378)

NORCOTT, FOTI and FREEDMAN, Js.

Argued February 11—decision released September 22, 1992

*Charles D. Gill, Jr.,* and *David J. Sheldon,* special public defenders, with whom, on the brief, was *Ramona S. Carlow,* for the appellant (defendant).

*Mary H. Lesser,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *Michael A. Pepper,* assistant state's attorney, for the appellee (state).

FREEDMAN, J. The defendant appeals from the judgment of conviction, rendered after a jury trial, of aiding and abetting the sale of narcotics in violation of General Statutes §§ 21a-278 (b) and 53a-8. He claims that the trial court improperly (1) refused to strike the entire testimony of the state's key witness pursuant to Practice Book § 755 and General Statutes § 54-86b,[1] (2) determined that the prosecutor struck the first two minority jurors for neutral reasons, and then refused to seat those two jurors when it later determined that the prosecutor engaged in purposeful discrimination, and (3) determined that the mitigating factors submitted by the defendant could not constitute a significant impairment of mental capacity pursuant to § 21a-278 (b). We reverse the judgment of the trial court and remand for a new trial.[2]

The jury could reasonably have found the following facts. On January 6, 1988, the New Haven police street crime narcotics task force conducted an undercover narcotics operation in the Hill section of New Haven.

---

[1] Practice Book § 755 provides: "If the prosecuting authority elects not to comply with an order of the judicial authority to deliver to the defendant any statement of a witness who has testified or such portion thereof as the judicial authority may direct, the judicial authority shall strike from the record the testimony of the witness, and the trial shall proceed unless the judicial authority, in his discretion, upon motion of the defendant, determines that the interests of justice require that a mistrial be declared."

General Statutes § 54-86b provides: "(a) In any criminal prosecution, after a witness called by the prosecution has testified on direct examination, the court shall on motion of the defendant order the prosecution to produce any statement oral or written of the witness in the possession of the prosecution which relates to the subject matter as to which the witness has testified, and the court shall order said statement to be delivered directly to the defendant for his examination and use.

"(b) If the prosecution fails to comply with the order of the court, the court shall strike from the record the testimony of the witness and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared."

[2] Because we agree with the defendant on his first issue, we need not address the defendant's other appellate issues.

Officer Frank Roberts, a member of the task force, was assigned to make undercover narcotics purchases from dealers on the street. Two surveillance teams were assigned as backups to Roberts, one of which included Officer Joseph Pettola.

By approximately 12:15 p.m., Roberts had been driving around the Hill area for nearly two hours, and had already made several undercover narcotics purchases. Pettola and his partner were parked at the intersection of Sylvan Avenue and Ward Street. At that time, Roberts stopped his car at the intersection of Elliot Street and Sylvan Avenue for approximately five to seven seconds. He saw two persons begin walking up Sylvan Avenue toward his car and one of them was waving his arms at Roberts. Roberts noted at the time that both individuals were black and were wearing beige jackets. Roberts then drove around the block so as to proceed to the intersection of Sylvan Avenue and Asylum Street where he had seen the two men, which was one block away from Pettola's surveillance position.

When Roberts reached the intersection, he saw two black men standing on the corner, and he pulled his car over to the curb next to them. The first black male approached Roberts and asked him what he wanted. Roberts replied, "I will take one twenty cent piece." The first male asked, "just one?" Roberts replied affirmatively to the question, and the first male then yelled and gestured to the second male to get "one piece." The second male then walked down Asylum Street to a tree, reached down and retrieved a small, yellow glassine envelope from a brown paper bag. The second male then proceeded to Roberts' car with the envelope. While the second male dealt with Roberts, the first male moved away from the car and looked up and down Sylvan Avenue. Roberts handed the second male twenty dollars, took possession of the envelope, and

drove away. The entire transaction lasted no more than one minute, and Pettola and his partner witnessed the entire transaction from their vantage point.

As Roberts drove away from the scene, he made written notes containing general descriptions of the two men, including their height, weight, clothing description, outstanding marks, age and skin color. Immediately thereafter, he radioed Pettola and gave him a description of the two men. Roberts described them as one wearing a knit hat with "Mercedes-Benz" written on it and the other wearing a similar hat with "BMW" on it. Pettola and his partner remained in surveillance of the two men, who did not leave the area. After waiting long enough so as not to disclose Roberts' cover, Pettola and his partner drove up the street to the two men and exited their car. They identified themselves as police officers and asked the two men for identification. Pettola recognized one of the men as Darryl Spears, and the other man, the defendant, produced a picture identification card and stated that his name was Roy Jones. Jones gave them his social security number and his home address, 74 Asylum Street.

Pettola and his partner left the scene without making an arrest or retrieving the alleged bag of narcotics near the tree. Later that same day, Pettola and Roberts met at the police station, where Roberts gave the yellow envelope to Pettola, who was to have it tested to determine if it contained a narcotic substance. While at the station, Pettola conducted a search of New Haven police department records for any information about Jones and Spears. The search indicated that Jones had previously been arrested for disorderly conduct, criminal mischief and breach of the peace.

On January 6, the same day that he gave the envelope for testing to Pettola, Roberts proceeded to dictate a police report, using his notes to refresh his

recollection concerning the chain of events earlier in the day. When the dictation was completed, he gave it to a secretary for transcription. On January 29, 1988, twenty-three days after Roberts made the dictation, the typist returned the typed report to Roberts, along with the dictation tape. The typed report indicated the heights for both Jones and Spears as "6'." Roberts testified that when he read the typed report on January 29, he noticed two mistakes in it, which he had confirmed by checking his field notes from January 6. Roberts then crossed out both typewritten heights, and handwrote "5'10″" as the height for Jones and "5'9″" as the height for Spears. Roberts initialed both cross-outs. Roberts then signed the typed report, dating it January 6, 1988, the date he had dictated it. Roberts testified that he had dictated "5'10″" and "5'9″" as the heights for Jones and Spears, respectively, but that the typist must have incorrectly heard "6'" in both instances. Roberts also admitted that the typed report contained biographical information about Jones and Spears of which he had no knowledge at the time he wrote his field notes.

The defendant was arrested on February 26, 1988. Roberts testified that after the arrest he threw away his notes because the sting operation had been completed. He also testified that, pursuant to department policy, the tape was erased so that it could be used for other dictation.

At trial, the state's only witnesses were Roberts, Pettola and a toxicologist who testified that the yellow envelope contained cocaine. Upon the completion of Roberts' direct testimony, the defendant moved, pursuant to Practice Book § 752, for production of all statements made by Roberts concerning this incident that the state had in its possession. The state gave the defendant a copy of Roberts' typewritten police report with Roberts' handwritten changes. When the state

failed to produce either Roberts' dictation tape or his field notes from January 6, the defendant moved, pursuant to Practice Book § 755, to have Roberts' entire testimony stricken. After hearing argument by counsel outside the presence of the jury, the trial court determined that it would strike only the in-court identification made by Roberts. The defendant objected to this sanction. Thereafter, without withdrawing his objection to the court's failure to strike Roberts' entire testimony, the defendant requested that since the court refused to strike all of Roberts' testimony, the court should prohibit all of the other state's witnesses from making in-court identifications of Jones, and should give an adverse inference instruction when it charged the jury. The trial court ruled that it would prohibit all of the other state's witnesses from making in-court identifications of the defendant. It reserved decision, however, on the defendant's request for an adverse inference instruction until it was time to instruct the jury. Subsequently, the trial court declined to give the instruction requested by the defendant, and he was convicted as charged.

The defendant claims that the trial court improperly refused to strike Roberts' entire testimony. He claims that Practice Book § 755 and General Statutes § 54-86b require that a state's witness' entire testimony be stricken when the court determines that the state's failure to produce "statements" is harmful. The state concedes that the dictation tape is a "statement" for purposes of Practice Book § 749.[3] The state argues, however, that the defendant was not harmed by the

---

[3] Practice Book § 749 provides: "The term 'statement' . . . means:

"(1) A written statement made by a person and signed or otherwise adopted or approved by him; or

"(2) A stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by a person and recorded contemporaneously with the making of such oral statement."

destruction and nonproduction of the tape, and thus urges our affirmance of the defendant's conviction.

Whereas the facts of this case necessitate this court's return, yet again, to the New Haven police department's policy of destruction of taped statements, we do so this time in a slightly different setting. Typically, we are presented with a case in which the trial court has found that the state satisfied its burden of proving harmlessness, and thus we must decide whether the trial court abused its discretion in making that finding. Here, however, the trial court has already determined that (1) the dictation tape contained a "statement" for the purpose of Practice Book § 749 et seq., (2) that the New Haven police destroyed the tape intentionally, although not maliciously or with the intent to deprive the defendant of the evidence contained therein, and (3) that the state failed to meet its burden of proving that the destruction of the tape was harmless beyond a reasonable doubt.[4] On the basis of those findings, the trial court precluded the other state's witnesses from the New Haven police depart-

[4] The trial court stated, in this regard: "The reason credibility of this particular witness is so important . . . is because he is the only one that heard the alleged conversation. There is no other testimony. I didn't hear anything about him being wired or anybody else. So his credibility is of utmost importance. To deprive the defendant of the opportunity to severely test his credibility in an easily identifiable method of cross-examination leads me to the conclusion that *I cannot make a finding that this destruction is harmless beyond a reasonable doubt.* I can't say it is harmless because it does not just reflect on identification. It reflects on credibility. [The defendant's] contention is that . . . he is entitled to explore the possibility that this police officer changed the report after he knew the measured heights of these two individuals to bolster his credibility. It is apparent to me that would be a temptation. I am not saying that the police officer succumbed to it because I don't have to make a determination in that regard, but clearly it is something that counsel is entitled to explore and cannot now explore because the tape and the notes do not exist. That's just restating why I believe that I can't find that the destruction of this tape and notes is harmless, and the court, I believe, it is a difficult decision to apply, but the court seems to acknowledge that when material is destroyed and I can't see it

ment from making in-court identifications of the defendant, but it declined the defendant's request to give an adverse inference instruction.

It has been recognized that the failure to provide material to which the defendant is entitled under Practice Book § 752 et seq. " 'may adversely affect a defendant's ability to cross-examine government witnesses and thereby infringe upon his constitutional right of confrontation.' " *State* v. *Williamson,* 212 Conn. 6, 20, 562 A.2d 470 (1989). "In such a case, a court would be warranted in strictly applying the harmless error doctrine to require the state to prove harmlessness beyond a reasonable doubt." *State* v. *Belle,* 215 Conn. 257, 269, 576 A.2d 139 (1990). Here, although the trial court did not expressly find that the nonproduction of the tape infringed upon the defendant's right of confrontation, we believe that such a finding is supported by the record.

"In determining the effect of the state's nonproduction on a defendant's opportunity to cross-examine, we have considered such factors as the trial or reviewing court's access to the unproduced material, the declarant's adoption of a counterpart transcript within a short time after making the statement, and the extent to which the defendant's conviction rested on the testimony of the witness whose pretrial statement had been destroyed." Id., 269–70. In this case, neither we nor the trial court had access to the unproduced material.

---

and the Appellate Court can't see it, it just makes the decision all the more harder; the finding of harmless beyond a reasonable doubt all the more harder or difficult.

"This is not the end of the state's case. I am only going to strike that portion of the officer's testimony that relates to identification. The other portions of the testimony are not tainted." (Emphasis added.) See *State* v. *Williamson,* 212 Conn. 6, 562 A.2d 470 (1989), for a discussion of the necessary findings to be made by a trial court, as well as the appropriate burden of proof to be imposed on the proper party, when considering a motion to strike pursuant to Practice Book § 755.

Roberts' adoption of a "counterpart" transcript was made twenty-three days after he dictated his report, during which time he had ample opportunity to check department records for the accuracy of his report. Additionally, Roberts did not "adopt" the entire counterpart transcript, as evidenced by the two changes regarding the heights of the suspects he made on the typewritten report. Finally, the defendant's conviction rested largely on the testimony of Roberts, who was the only witness who testified regarding the details of the alleged drug deal, and without whose testimony the state would not be able to establish a complete chain of custody concerning the narcotics he allegedly purchased from the defendant and his partner. The trial court, therefore, properly required the state to prove that the destruction of the tape was harmless beyond a reasonable doubt.

The state does not challenge the findings of the trial court as incorrect but appears to base its argument on the premise that the court never made these findings. It is the position of the state that the failure of the trial court to give an adverse inference charge should be interpreted as a finding that the nonproduction of the tape was harmless. A thorough examination of the record leads us to conclude that the findings were in fact made by the trial court, which conclusion is further evidenced by the fact that the trial court imposed sanctions by precluding in-court identifications of the defendant by the New Haven police officers involved in this matter. The state may not now challenge these findings of the trial court as they have failed to raise such a challenge properly.[5]

[5] Practice Book § 4013 (a) (1) provides in pertinent part: "If any appellee wishes to (A) present for review alternate grounds upon which the judgment may be affirmed . . . that appellee shall file a preliminary statement of issues within fourteen days from the filing of the appellant's preliminary statement of the issues."

The state's claim also does not warrant plain error review. See Practice Book § 4185. Plain error review is reserved for "truly extraordinary situ-

The narrow issue with which we are presented, therefore, is whether the trial court was required, pursuant to Practice Book § 755 and General Statutes § 54-86b, to strike a state's witness' entire testimony when the trial court has found that the state's failure to produce § 749 pretrial statements of the particular witness harmed the defendant. "The appropriate sanctions for the state's failure to comply with discovery are set forth in Practice Book § 755. That section requires the trial court either to strike the testimony of the state's witness or 'upon motion of the defendant' to declare a mistrial if 'the interests of justice require.' " *State* v. *Silva,* 201 Conn. 244, 251, 513 A.2d 1202 (1986). In *State* v. *Williamson,* supra, 28, the court held that because the defendant was harmed by the destruction of the statement, the Appellate Court properly concluded that the trial court abused its discretion in not striking the entire testimony of the witness whose statement had been destroyed. In *In re Jesus C.,* 21 Conn. App. 645, 652, 575 A.2d 1031 (1990), we held that where the state failed to prove the harmlessness of the nonproduction of the statements of two particular witnesses, the trial court abused its discretion by not striking the entire testimony of those two witnesses. Here, the trial court abused its discretion by failing to strike Roberts' entire testimony after it had concluded that the destruction of the tape of Roberts' statement harmed the defendant.

We find unpersuasive the state's argument that the jury was aware of the erasure of the tape and that the defendant cross-examined Roberts at length concerning the inconsistency. The jury's awareness of the era-

ations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in judicial proceedings." (Internal quotation marks omitted.) *State* v. *Brown,* 19 Conn. App. 640, 644, 563 A.2d 1379, cert. denied, 212 Conn. 821, 565 A.2d 540 (1989). We do not believe this is such a case.

sure is irrelevant to the question of whether the defendant has been harmed, a question already decided by the trial court in the defendant's favor, and the jury's possible speculation as to the contents of the unproduced material is not entitled to any weight. *State* v. *Williamson,* supra, 27–28. "Indeed . . . a conclusion that the defendant has not been prejudiced solely because defense counsel utilized other impeachment sources and was given wide latitude in cross-examination would penalize defendants for the best representation their counsel could provide with the available information." Id., 26. Furthermore, this argument goes to the trial court's finding that the defendant was harmed by the nondisclosure of the tape, a finding that the state has failed to challenge properly on appeal.

Because the trial court, having concluded that the failure to produce the tape was harmful to the defendant, was required either to strike the entire testimony of Roberts or to declare a mistrial, we hold that the trial court abused its discretion in refusing to strike Roberts' entire testimony.

The judgment of conviction is set aside and the case is remanded for a new trial.

In this opinion FOTI, J., concurred.

NORCOTT, J., dissenting in part, concurring in the result only. While I agree with the judgment reversing the conviction and ordering a new trial, I do not agree with the legal analysis or legal conclusions contained in the majority's opinion. Because I would reverse on different grounds, I write separately to express my departure from the reasoning of the court and my reasons therefor.

In my opinion, a new trial is required not because Officer Frank Roberts' testimony should have been stricken, but because the trial court failed to grant the

defendant an appropriate remedy after determining that the prosecutor had engaged in purposeful racial discrimination in the exercise of peremptory challenges in violation of *Batson* v. *Kentucky,* 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

At the outset, I note that the majority's analysis rests on the trial court's application of an improper burden of proof under the harmless error inquiry our Supreme Court requires in the context of violations of Practice Book § 752. Because the majority fails to recognize this error, it unnecessarily reaches the question of whether all or part of Roberts' testimony should have been stricken.[1] In my view, application of the proper bur-

---

[1] Even if this question were properly before us and I agreed that destruction of the statement was not harmless, I would disagree with the majority's conclusion that the trial court "abused its discretion" in failing to strike Roberts' testimony. I would find that the failure to apply one of the two sanctions permitted by Practice Book § 755 constitutes plain error.

Contrary to the trial court's statement that "the findings [as to whether a violation occurred] are within my discretion *as are the sanctions*"; (emphasis added); our Supreme Court has unequivocally stated that Practice Book §§ 752 and 755, which " 'repeatedly [employ] the word "shall," are mandatory.' " *State* v. *Williamson,* 212 Conn. 6, 13, 562 A.2d 470 (1989), quoting *State* v. *Gonzales,* 186 Conn. 426, 432, 441 A.2d 852 (1982). The same principle applies with equal force to General Statutes § 54-86b (b), which also requires that the court "shall" strike the witness' testimony or declare a mistrial.

"[A] trial court's failure to follow the mandatory provisions of a statute prescribing trial procedures or to follow a procedural rule is plain error." *State* v. *Johnson,* 214 Conn. 161, 171 n.10, 571 A.2d 79 (1990); *State* v. *Guckian,* 27 Conn. App. 225, 246, 605 A.2d 874, cert. granted, 223 Conn. 907, 612 A.2d 57 (1992). Similarly, it is plain error where a trial court fails to adhere to a clearly applicable Practice Book rule. *Cummings & Lockwood* v. *Gray,* 26 Conn. App. 293, 300, 600 A.2d 1040 (1991); *In re Jonathan P.,* 23 Conn. App. 207, 211, 579 A.2d 587 (1990). The only discretion a trial court has in applying § 755 lies in deciding whether to strike the witness' testimony or to declare a mistrial. Because the trial court applied a remedy *not called for* by § 755, it committed plain error.

I also disagree with the majority's holding that § 755 requires striking the witness' *entire* testimony. First, the cases the majority relies on do not support this assertion. Neither *In re Jesus C.,* 21 Conn. App. 645, 575 A.2d 1031 (1990), nor *State* v. *Williamson,* supra, hold that the witness' entire

den of proof results in a finding that the tape's destruction was harmless. The judgment should be reversed, however, on the ground of the trial court's failure to grant an appropriate remedy for the prosecutor's misconduct in the exercise of peremptory challenges.

I

## DESTRUCTION OF TAPE RECORDING

At trial, the court found that the tape was a "statement" within the meaning of Practice Book § 749 et seq. and that it was not destroyed in "bad faith" as that term is defined in *State* v. *Williamson*, 212 Conn. 6, 562 A.2d 470 (1989).[2] Having found that the state

testimony must be stricken. Phrases such as "entire testimony" or "all the testimony" do not even appear in these decisions. In fact, *In re Jesus C.*, supra, cuts against the majority's holding. There, this court said that "in appropriate circumstances, *the affected testimony* may be struck as a sanction." (Emphasis added.) Id., 648.

Second, a per se rule requiring that the witness' entire testimony be stricken would work an injustice in many instances where evidence unrelated to the incident at issue also would be stricken, thereby requiring the state to drop its charges. The only situation in which this is a proper result is when the witness' *entire* testimony relates *only* to the alleged incident. It should not be forgotten that the purpose of § 755 is to deter police misconduct. By applying the sanction of § 755 more broadly than necessary, a court effects an untoward result that overcompensates for that misconduct and undermines the public's confidence in the fairness of our system of justice.

Third, the majority's position finds a paucity of support in federal case law. When our Supreme Court has not yet spoken on a § 755 issue, we look to the federal judiciary for guidance because § 755 is derived from the Jencks Act, 18 U.S.C. § 3500. *State* v. *Williamson*, supra, 13. Among the federal courts, only the United States Court of Appeals for the Sixth Circuit has said that the witness' entire testimony must be stricken or a new trial ordered when a Jencks violation has been made out. See *United States* v. *Pope*, 574 F.2d 320, 325 (6th Cir.), cert. denied, 436 U.S. 929, 98 S. Ct. 2828, 56 L. Ed. 2d 774 (1978). A ruling by a single federal court is hardly persuasive authority for the per se rule the majority announces today.

[2] In the context of a violation of Practice Book § 752, "bad faith" is "a deliberate act done with intent to deprive the defense of information." *State* v. *Williamson*, 212 Conn. 6, 16, 562 A.2d 470 (1989); see also *State* v. *Cerilli*, 222 Conn. 556, 577, 610 A.2d 1130 (1992); *State* v. *Belle*, 215 Conn. 257, 265 n.8, 268, 576 A.2d 139 (1990).

did not disclose the tape to the defendant, the court then failed to hold the state to the proper burden of proof in determining whether the defendant was prejudiced by nonproduction of the tape. The court held the state to the standard of proving harmlessness beyond a reasonable doubt. In my view, the state should have been required to prove lack of prejudice under the more probable than not standard.

## A

### REVIEWABILITY

As a threshold matter, it should be noted that although the state objected to the trial court's finding of harmfulness, it has not challenged that decision on appeal. Nevertheless, this court may exercise its discretion and notice plain error. Practice Book § 4185.[3] Reversal for plain error is generally " 'reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings.' " *Saporoso* v. *Aetna Life & Casualty Co.,* 221 Conn. 356, 363, 603 A.2d 1160 (1992), quoting *State* v. *Hinckley,* 198 Conn. 77, 87–88, 502 A.2d 388 (1985); *State* v. *Guckian,* 27 Conn. App. 225, 246, 605 A.2d 874, cert. granted, 223 Conn. 907, 612 A.2d 57 (1992). The language of General Statutes § 54-86b (b) and the provisions of Practice Book §§ 752 and 755 are mandatory. *State* v. *Williamson,* supra, 13, quoting *State* v. *Gonzales,* 186 Conn. 426, 432, 441 A.2d 852 (1982). A court commits plain error when it fails to implement properly the mandatory provisions of clearly applicable rules of practice; *Cummings & Lockwood* v. *Gray,*

---

[3] Practice Book § 4185 provides in pertinent part: "The [appellate] court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The [appellate] court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."

26 Conn. App. 293, 300, 600 A.2d 1040 (1991); *In re Jonathan P.,* 23 Conn. App. 207, 211, 579 A.2d 587 (1990); and clearly applicable statutes prescribing trial procedures. *State* v. *Johnson,* 214 Conn. 161, 171 n.10, 571 A.2d 79 (1990); *State* v. *Guckian,* supra. In such cases, "the plain error doctrine must be invoked." *In re Jonathan P.,* supra. This is such a case.

In determining whether an accused is harmed by the state's deliberate, but not bad faith, failure to produce a disclosable statement, a court must "weigh the culpability of the state for its failure to make disclosable material available on the one hand, against any resulting prejudice to the defendant on the other." (Internal quotation marks omitted.) *State* v. *Cerilli,* 222 Conn. 556, 577, 610 A.2d 1130 (1992); *State* v. *Belle,* 215 Conn. 257, 268, 576 A.2d 139 (1990). When the state destroys disclosable statements, it must prove the harmlessness of its acts because destruction or preservation of such material is totally within its control. *State* v. *Belle,* supra, 268–69 n.11; *State* v. *Johnson,* supra, 172; *State* v. *Williamson,* supra, 18. "[T]he proper harmless error inquiry is whether the result of the trial may have been different had the state not violated the rule." (Internal quotation marks omitted.) *State* v. *Belle,* supra, 268.

## B

### DETERMINATION OF STATE'S BURDEN OF PROOF IN SHOWING WHETHER DEFENDANT HARMED BY TAPE'S DESTRUCTION

That leaves the question of whether the state's burden of proof in showing harmlessness is the more probable than not standard or the harmless beyond a reasonable doubt standard. "The appropriate standard to be applied . . . depends upon the particular circumstances of the case." Id., 269; *State* v. *Johnson,* supra, 173–75. Our Supreme Court has said that when the

defendant's ability to cross-examine is at issue, "we have considered such factors as the trial or reviewing court's access to the unproduced material, the declarant's adoption of a counterpart transcript within a short time after making the statement, and the extent to which the defendant's conviction rested on the testimony of the witness whose pretrial statement had been destroyed." *State* v. *Belle,* supra, 269–70; see *State* v. *Johnson,* supra, 173–74.[4]

In *State* v. *Williamson,* supra, where the court found that it would not have been improper to apply the harmless beyond a reasonable doubt standard; see *State* v. *Johnson,* supra; the court "relied on several factors that indicated that Williamson's opportunity to impeach the state's witness was so impaired that the nonproduction of that witness' pretrial statement violated [the defendant's] constitutional right to confront the witnesses against him: 'This is not a case in which either the trial court or a reviewing court has access to the unproduced material. . . . Further . . . this is not a case in which the declarant read and adopted a counterpart transcript within a short time after making the statement. . . . Moreover, the defendant's conviction obviously rested on [the testimony of the witness whose pretrial statement had been destroyed].' " Id., 174, quoting *State* v. *Williamson,* supra, 22–23; see *State* v. *Belle,* supra, 269–70.

By contrast, the court in *State* v. *Johnson,* supra, 175, and in *State* v. *Belle,* supra, 271, determined that the more probable than not standard was appropriate. In

---

[4] Although our Supreme Court's decisions in *State* v. *Belle,* 215 Conn. 257, 576 A.2d 139 (1990), and *State* v. *Johnson,* 214 Conn. 161, 571 A.2d 79 (1990), had not been released until after the defendant's trial, these criteria were applied in *State* v. *Williamson,* 212 Conn. 6, 22–23, 562 A.2d 740 (1989), which the trial court discussed extensively with counsel during oral argument on the defendant's request that Roberts' testimony be stricken.

*Johnson,* the witness read and signed a transcription made from the destroyed tape three days after giving the statement, and the defendant's conviction was not based solely on that witness' testimony but on circumstantial evidence from other witnesses as well. *State* v. *Johnson,* supra, 174. Similarly, in *Belle,* both witnesses reviewed and signed transcriptions of their taped statements shortly after giving them, and the defendant's conviction also did not rest solely on their testimony but on circumstantial evidence from another source. *State* v. *Belle,* supra, 270–71.

In this case, careful review of the record discloses that the court failed to apply properly the criteria used in *State* v. *Williamson,* supra, 22–23.[5] Although it stated that it did not have access to the tape, the trial court failed to consider that Roberts adopted the transcription a short time after the crime. The court also failed to inquire into the substance of the testimony of witnesses the state had informed the court it would call so as to determine to what extent a conviction might rest on Roberts' testimony.[6]

---

[5] Although the court stated, "I think I am familiar enough to go through this step by step test," it failed to apply properly the criteria and ultimately ruled on other grounds.

During colloquy with counsel, the court said, "I really don't rely that heavily on [*Williamson*]." Later, when it precluded subsequent in-court identifications of the defendant, the court told the defendant, "I will go along with part of your request on the question of subsequent identifications. Not on a *Williamson* rationale . . . it is more of a suppression of identification issue." Thus, the court reached the wrong result for the wrong reasons.

[6] The record makes crystal clear that the court did not explore either of these criteria, but instead restricted its inquiry to a series of conclusory statements about the issue of credibility: "The reason credibility of this particular witness is so important, maybe not as to identification but because there will be other witnesses in that regard from what I am led to believe and from the reading of the warrant which is a part of the file. The reason credibility is so important is because he is the only one that heard the alleged conversation. There is no other testimony. I didn't hear anything about him being wired or anybody else. So his credibility is of utmost importance. To deprive the defendant of the opportunity to severely test his credibility

I believe that when the *Williamson* criteria are properly applied, it is evident that the state should have been required to prove harmlessness under the more probable than not standard. Although neither the trial court nor this court has had access to the destroyed tape, Roberts adopted the transcript a mere twenty-three days after receiving it from the typist.[7] As in *Belle* and *Johnson,* both adoptions occurred a short time after the crime. See *State* v. *Belle,* supra, 272 (transcripts reviewed and adopted a short time after taped statements given); *State* v. *Johnson,* supra, 176 (transcript reviewed three days after taped statement given); see also *State* v. *Santangelo,* 205 Conn. 578, 589, 534 A.2d 1175 (1987) (typed transcript signed five days after tape-recorded statement); cf. *State* v. *Williamson,* supra, 10–11 (fact that transcript of tape not reviewed by witness until seven months after alleged crime significant in determining that state had not proven harmlessness).

Further, as in *Belle* and *Johnson,* the defendant's conviction was not based solely on Roberts' testimony. It

in an easily identifiable method of cross-examination leads me to the conclusion that I cannot make a finding that this destruction is harmless beyond a reasonable doubt. I can't say it is harmless because it does not just reflect on identification. It reflects on credibility . . . it is a difficult decision to apply, but the court seems to acknowledge that when material is destroyed and I can't see it and the Appellate Court can't see it, it just makes the decision all the more hard; the finding of harmless beyond a reasonable doubt all the more hard or difficult."

[7] There is no indication in the record whatsoever that this delay was the result of anything other than, simply, the speed of the typist in making the transcription and getting it back to Roberts.

Roberts also "adopted" his written notes when he used them to dictate his report onto the tape only hours after writing the notes in his car while leaving the area of Sylvan Avenue and Asylum Street. The notes of a police officer who is a witness in a criminal proceeding can be "statements" subject to disclosure within the meaning of Practice Book § 749 if they are "signed or otherwise adopted" by the officer. *State* v. *Belle,* 215 Conn. 257, 266, 576 A.2d 139 (1990); *State* v. *Monteeth,* 208 Conn. 202, 216, 544 A.2d 1199 (1988).

also was based on the testimony of officer Pettola and was integrally dependent on the state toxicologist's testimony. Both provided direct and circumstantial evidence, consistent with Roberts' testimony, that linked the cocaine and the defendant to the crime. Cf. *State v. Johnson,* supra, 174; *State v. Williamson,* supra, 23 (defendant's conviction rested solely on testimony of witness whose statement was destroyed). Under these circumstances, it is clear that the majority's analysis makes "a constitutional mountain out of [a] . . . molehill." *State v. Walker,* 215 Conn. 1, 11, 574 A.2d 188 (1990). The state's failure to produce the tape did not rise to the level of a denial of the defendant's sixth amendment right to confrontation. Accordingly, I would find that the trial court improperly required the state to prove harmlessness beyond a reasonable doubt when it should have required proof under the more probable than not standard. See, e.g., *State v. Belle,* supra, 271; *State v. Johnson,* supra, 175; *State v. Tyson,* 23 Conn. App. 28, 40, 579 A.2d 1083, cert. denied, 216 Conn. 829, 582 A.2d 207 (1990).

## C

### APPLICATION OF BALANCING TEST TO DETERMINE HARMFULNESS

In applying the balancing test set forth previously, we must weigh the state's culpability for the tape's destruction against the prejudice suffered by the defendant to determine whether the trial court should have applied the sanction of striking Roberts' testimony as mandated by Practice Book § 755. Roberts destroyed the tape deliberately, though not in bad faith. See *State v. Williamson,* supra, 16. Turning to the question of prejudice, "[w]here there are critical inconsistencies between trial testimony and prior statements . . . a defendant may be prejudiced by the absence of the tape recording. . . . Where all indications are, however,

that the witness has given consistent statements, we have been reluctant to find that the defendant suffered prejudice." (Citation omitted.) *State* v. *Johnson,* supra, 175–76.

In this case, I would find that the defendant was not prejudiced by the tape's destruction. This conclusion is buttressed by several undisputed facts the significance of which the majority ignores. First, Roberts dictated the tape using his written notes only hours after encountering the defendant at the intersection of Sylvan Avenue and Asylum Street. Second, the tape was not in his possession during the twenty-three days it took to have the transcript typed. Third, when he received the transcription, he made only two minor handwritten changes, which he initialed for all to see. Thus, it follows that because Roberts could not have altered the tape's contents, the transcript cannot be anything other than a highly reliable, "substantially verbatim recital" of what he dictated. Practice Book § 749 (2).

Although the majority's approach leads it to seize on the twenty-three day gap, this is irrelevant to the defendant's ability to test effectively Roberts' credibility without the tape. The majority contends that in those twenty-three days, Roberts could have gone to the police records room to check the accuracy of his report. Even if he had done so, this would say nothing about his inability to alter the tape, which was not in his possession during those twenty-three days. Further, had the officer truly been eager to "clean up" his report, it would have made more sense to have the two page transcription retyped than for Roberts to make handwritten, initialed changes.

In addition, several other factors mitigate strongly against any prejudice to the defendant. First, the defendant was provided with a transcription, which,

as noted above, was a highly reliable, substantially verbatim account of what Roberts dictated. Second, the defendant used that transcription to cross-examine Roberts and failed to disclose any critical inconsistencies between his trial testimony and the transcribed statement. Cf. *State* v. *Williamson,* supra, 25 (several critical inconsistencies between witness' transcribed statement and witness' recollection of what she told police). Third, although Roberts' testimony was important to the state, the majority's assertion that the defendant's conviction "rested largely" on that testimony is hyperbole.

When other testimony corroborates that of the witness who destroyed a statement, our Supreme Court has found it improper to impose a sanction pursuant to Practice Book § 755. See, e.g., *State* v. *Milum,* 197 Conn. 602, 618, 500 A.2d 555 (1985). Here, the majority completely ignores that Pettola's testimony corroborated that of Roberts. Pettola testified that he witnessed the incident at Sylvan Avenue and Asylum Street, and that "seconds"[8] after Roberts drove away, Roberts radioed to him descriptions of the defendant and Spears. Pettola further testified that he then drove to the scene, spoke with the defendant and Spears, both of whom identified themselves by name, and noticed that they matched the descriptions. Thus, Pettola corroborated Roberts' testimony in all important respects. Further, the majority gives short shrift to the toxicologist's testimony identifying as cocaine the substance the defendant sold to Roberts. This simply is not a case where " 'the appellant's conviction rests heavily on the credibility of a single [witness].' " *State* v. *Williamson,* supra, 21, quoting *United States* v. *Wallace,* 848 F.2d 1464, 1471 (9th Cir. 1988); *State* v. *Tyson,* supra; *State* v. *Sinclair,* 20 Conn. App. 586, 593, 569 A.2d 551 (1990).

---

[8] Roberts also testified that he radioed to Pettola "in less than a minute" after purchasing drugs from the defendant.

In sum, since Roberts could not have altered the tape during the twenty-three day interval, the transcript constitutes a substantially verbatim recital of the tape's contents. In dictating the tape, Roberts relied on his written notes, which he made only hours earlier. He adopted the transcription of the tape a short time after the incident in question, finding only two minor inaccuracies that he corrected and initialed in his own handwriting for all to see. Moreover, two other witnesses provided direct and circumstantial evidence that was consistent with Roberts' testimony and report. It strains credulity to believe that preservation of the tape for cross-examination purposes would have " 'tipped the balance of persuasion in [the defendant's] favor.' " *State* v. *Williamson,* supra, 21, quoting *United States* v. *Wallace,* supra, 1472; *State* v. *Sinclair,* supra.

I, too, appreciate the importance of protecting an accused's ability to conduct effective cross-examination, "the principal means by which the believability of a witness and the truth of his testimony" are measured. *Davis* v. *Alaska,* 415 U.S. 308, 316, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); *State* v. *Milner,* 206 Conn. 512, 524, 539 A.2d 80 (1988). Nevertheless, the majority finds harm where none exists. Although the seemingly intractable behavior of the New Haven police department with respect to witness' statements[9] is deeply dis-

---

[9] This case presents no less than the fourteenth occasion since 1980 that this court or our Supreme Court has had to consider a matter involving the loss or destruction of a witness' statement by members of what is rapidly becoming the bete noire of Connecticut police departments. See *State* v. *Cerilli,* 222 Conn. 556, 572–80, 610 A.2d 1130 (1992); *State* v. *Belle,* 215 Conn. 257, 576 A.2d 139 (1990); *State* v. *Johnson,* 214 Conn. 161, 571 A.2d 79 (1990); *State* v. *Williamson,* 212 Conn. 6, 562 A.2d 470 (1989); *State* v. *Kelly,* 208 Conn. 365, 545 A.2d 1048 (1988); *State* v. *Santangelo,* 205 Conn. 578, 534 A.2d 1175 (1987); *State* v. *Mullings,* 202 Conn. 1, 519 A.2d 58 (1987); *State* v. *Myers,* 193 Conn. 457, 479 A.2d 199 (1984); *State* v. *Shaw,* 185 Conn. 372, 441 A.2d 561 (1981), cert. denied, 454 U.S. 1155, 102 S. Ct. 1027, 71 L. Ed. 2d 312 (1982); *State* v. *Woodard,* 27 Conn. App. 786, 791–94, 609 A.2d 1027 (1992); *State* v. *Tyson,* 23 Conn. App. 28, 579 A.2d 1083 (1990);

turbing, not every violation of Practice Book § 752 merits a sanction. *State* v. *Williamson,* supra, 13. Such is the case here because, under the circumstances, destruction of the tape was harmless, and the result of the trial would not have been different had it been preserved. *State* v. *Belle,* supra, 268. For these reasons, I would find that the trial court's rulings with respect to the destruction of the tape do not constitute plain error.

II

RACIAL DISCRIMINATION IN JURY SELECTION

In my view, then, the dispositive issue is whether the trial court granted the defendant an appropriate remedy after finding that the prosecutor's use of a peremptory challenge against a black veniremember was based on purposeful racial discrimination. Because I believe that the court failed to remedy adequately the prosecutor's misconduct, I would reverse the defendant's conviction and remand this case for a new trial.

When reviewing a trial court's rulings on a prosecutor's peremptory challenges, we must examine the factual record of the jury selection process. *State* v. *Smith,* 222 Conn. 1, 12–15, 608 A.2d 63 (1992); *State* v. *Gonzalez,* 206 Conn. 391, 393, 538 A.2d 210 (1988). Here, the defendant is black. Jury selection took place over four days, with a new venire of fifteen members being summoned each day. In all, there were sixty people in the jury pool, including five blacks and two Hispanics. The state and the defendant each were allowed six peremptory challenges. The defendant used all six of his challenges to excuse white veniremembers; the state used three against the blacks, two against the Hispanics and one against a white.

---

*In re Jesus C.,* 21 Conn. App. 645, 575 A.2d 1031 (1990); *State* v. *Williamson,* 14 Conn. App. 108, 552 A.2d 815, aff'd, 212 Conn. 6, 562 A.2d 470 (1989); *State* v. *Sims,* 12 Conn. App. 239, 530 A.2d 1069 (1987), cert. denied, 206 Conn. 801, 535 A.2d 1315 (1988).

On the first day, ten members of the venire, including three blacks, were voir dired. The parties selected one juror that day, a white woman. The only peremptory challenges the prosecutor employed were used to excuse the three blacks.[10] The trial court determined that the first two were excused for nonracial reasons, but that the prosecutor had engaged in purposeful racial discrimination in striking the third. As a remedy for the prosecutor's misconduct, the court seated the third black veniremember and granted the defendant four additional peremptory challenges. Subsequently, the defendant was convicted by a jury of six.[11] The only minority juror was the black veniremember whom the court seated.

On appeal, the defendant maintains that he was deprived of a fair trial, in violation of rights guaranteed to him by the equal protection clause of the fourteenth amendment to the United States constitution, and by article first, §§ 1, 8, 19 and 20, of the Connecticut constitution, because of purposeful racial discrimination in the selection of the petit jury that convicted him.[12] The defendant argues that when the court determined that the prosecutor had engaged in purposeful racial discrimination in striking the third black

---

[10] The two other blacks were part of the third day's venire and were excused by the court. The second day's venire contained the two Hispanics, both of whom the state excused using peremptory challenges. The trial court ruled that the Hispanic veniremembers were properly stricken, and the defendant raises no claim on appeal as to them.

[11] The exact composition of the jury is unknown because there is no record of the final day of voir dire. Both parties, however, agree the jury consisted of six members, only one of whom was black. The parties differ about the number of alternates selected. The state claims there was one alternate; the defendant claims there were two. This difference has no bearing on the result I would reach.

[12] Because the defendant's brief contains no more than the bare assertion that his rights under the state constitution were violated, I would find this part of his claim abandoned; *State* v. *Hernandez*, 204 Conn. 377, 394 n.9, 528 A.2d 794 (1987); and decide this matter on federal grounds. *State* v. *Gonzalez*, 206 Conn. 391, 393–94 n.2, 538 A.2d 210 (1988).

veniremember, it should have reviewed the first two peremptory challenges, found the reasons for them to be pretextual, and then recalled and seated the first two black veniremembers.

Because the defendant's claim raises heretofore undecided issues concerning a matter of "vital importance to our real and perceived adherence to the rule of law"; *State* v. *Holloway,* 209 Conn. 636, 645–46, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989); *State* v. *Smith,* supra, 10–11; it is important first to review the procedures by which a court determines if there has been purposeful racial discrimination in a prosecutor's use of peremptory challenges.

## A

### PROCEDURES FOR EVALUATING USE OF PEREMPTORY CHALLENGES

A defendant who challenges the state's use of a peremptory challenge must prove by a preponderance of the evidence that it was based on purposeful racial discrimination. *Batson* v. *Kentucky,* 476 U.S. 79, 94 n.18, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). Under *Batson,* once the defendant establishes a prima facie case of purposeful racial discrimination,[13] the state then

---

[13] To make a prima facie showing of discrimination under *Batson* v. *Kentucky,* 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), " 'the defendant first must show that he is a member of a cognizable racial group . . . and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." . . . Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.' " *State* v. *Holloway,* 209 Conn. 636, 641, 553 A.2d 166 (1989), quoting *Batson* v. *Kentucky,* supra, 96.

must advance a neutral explanation for the peremptory strike. Id., 97. The defendant then has the opportunity to show that the state's articulated reasons are insufficient or pretextual. *State* v. *Smith,* supra, 11; *State* v. *Holloway,* supra, 641.

In *State* v. *Holloway,* supra, the Connecticut Supreme Court departed from *Batson,* ruling that the accused need not first make out a prima facie case.[14] The court determined that once a defendant asserts a *Batson* claim, the prosecutor should then provide "a prima facie case response consistent with the explanatory mandate of *Batson.*" Id., 645–46. This requires the prosecutor to give a neutral "clean and reasonably specific" explanation that relates to the particular case to be tried. *Batson* v. *Kentucky,* supra, 98 n.20. The explanation "need not rise to the level justifying exercise of a challenge for cause." Id., 97. After the state presents its reasons, the defendant has the opportunity to show that they are insufficient or pretextual. *State* v. *Holloway,* supra, 641.

To satisfy his burden of showing purposeful discrimination, "the defendant must show by a preponderance of the evidence that, but for the prosecutor's invidious purpose, the juror would not have been challenged.

---

[14] The court stated that rather than deciding, based on the existence of a prima facie case, whether an accused is entitled to an explanation of the prosecutor's use of peremptory challenges, " 'the better course to follow would be to hold a *Batson* hearing on the defendant's request whenever the defendant is a member of a cognizable racial group and the prosecutor exercises peremptory challenges to remove members of defendant's race from the venire.' " *State* v. *Holloway,* 209 Conn. 636, 646 n.4, 553 A.2d 166 (1989), quoting *State* v. *Jones,* 293 S.C. 54, 57–58, 358 S.E.2d 701 (1987).

Because *Holloway* departed from the *Batson* inquiry process, I would overrule our dicta in *State* v. *Graham,* 21 Conn. App. 688, 711–12, 575 A.2d 1057, cert. denied, 216 Conn. 805, 577 A.2d 1063 (1990), where we said the prosecutor's response is required "[o]nce a defendant successfully makes a prima facie showing" of discrimination, and that because the prosecutor was required to state reasons, "the court impliedly ruled that the defendant had raised a reasonable question of discrimination."

. . . The defendant need not show that the peremptory challenge of every juror of the defendant's race was due to an impermissible motive; rather, under *Batson*, the striking of even one juror on the basis of race violates the equal protection clause, even when other jurors of the defendant's race were seated and even when valid reasons for the striking of some of the jurors of the defendant's race were shown." (Citations omitted.) *State* v. *Gonzalez*, supra, 399–400.

## B

### STANDARD OF REVIEW

Recently, the United States Supreme Court clarified how an appellate court must scrutinize a trial court's implementation of *Batson*. See *Hernandez* v. *New York*, 500 U.S. , 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991). A prosecutor's explanation for his actions is to be reviewed as a legal issue;[15] id., 1866; and the court's ultimate factual ruling on whether he intentionally discriminated is subject only to clear error review. Id., 1868–69. This accords with the Connecticut Supreme Court's view that on appellate review, a trial court's determination as to whether there has been intentional discrimination is afforded " 'appropriate deference.' " *State* v. *Smith*, supra; *State* v. *Holloway*, supra, 641. Although the Connecticut Supreme Court has not yet had occasion to articulate what constitutes "appropriate deference" in a *Batson* context, it has indicated that the "clearly erroneous" standard[16] is appropriate in

---

[15] In *Hernandez* v. *New York*, 500 U.S. , 111 S. Ct. 1859, 1866, 114 L. Ed. 2d 395 (1991), the court stated, "In evaluating the race-neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law."

[16] This standard is applied by nearly all of the federal Circuit Courts of Appeal. See, e.g., *United States* v. *Bishop*, 959 F.2d 820 (9th Cir. 1992); *United States* v. *Day*, 949 F.2d 973, 980 (8th Cir. 1991); *Andrews* v. *Deland*, 943 F.2d 1162, 1180 (10th Cir. 1991); *United States* v. *Clemons*, 941 F.2d

reviewing a trial court's ruling on the ultimate question of whether a prosecutor has acted with forbidden intent. See *State* v. *Holloway, supra,* 644–45 (trial court's ruling that defendant failed to establish racial animus in prosecutor's use of peremptory challenge "not erroneous").

# C

## EXPLANATION REQUIREMENT AND PRETEXT INQUIRY

As mentioned, the legal issue on which a reviewing court focuses is whether the prosecutor's proffered neutral explanation is violative of the equal protection clause as a matter of law. A neutral explanation "means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the *facial validity* of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." (Emphasis added.) *Hernandez* v. *New York, supra,* 1866. If this reason, however, is "without regard to the particular circumstances of the trial or the individual responses of the jurors, [it] may be found by the trial judge to be a pretext for racial discrimination." Id., 1873. Thus, *Hernandez* requires a nexus between the prosecutor's challenge to the characteristic of the prospective juror and that juror's possible approach to the trial at hand. *United States* v. *Bishop,* 959 F.2d 820, 825 (9th Cir. 1992).

Here, because the prosecutor's proffered reasons for striking the first two black veniremembers were race

321, 325 (5th Cir. 1991); *United States* v. *Williams,* 936 F.2d 1243, 1246 (11th Cir. 1991); *United States* v. *Peete,* 919 F.2d 1168, 1179 (6th Cir. 1990); *United States* v. *Biaggi,* 909 F.2d 662, 679 (2d Cir. 1990); *Harrison* v. *Ryan,* 909 F.2d 84, 85 n.1 (3d Cir. 1990); *United States* v. *Lane,* 866 F.2d 103, 105 (4th Cir. 1989); *United States* v. *Angiulo,* 847 F.2d 956, 985 (1st Cir. 1988); *United States* v. *Mathews,* 803 F.2d 325, 329 (7th Cir. 1986), cert. granted, 480 U.S. 945, 107 S. Ct. 1601, 94 L. Ed. 2d 788 (1987).

neutral on their faces, the issue is whether the defendant has shown that the reasons were pretextual, and whether he has met his burden of proving, by a preponderance of the evidence, that the prosecutor engaged in purposeful racial discrimination with respect to those veniremembers.

Although neither *Batson* nor *Hernandez* spells out specific criteria a defendant may use to establish pretext, the court in *Hernandez* stated that disparate impact, although not conclusive in the race neutrality step of the *Batson* inquiry, "should be given appropriate weight in determining whether the prosecutor acted with a forbidden intent." *Hernandez* v. *New York,* supra, 1867. "If a prosecutor articulates a basis for a peremptory challenge that results in the disproportionate exclusion of members of a certain race, the trial judge may consider that fact as evidence that the prosecutor's stated reason constitutes a pretext for racial discrimination." Id., 1868. Additionally, the court recognized that at this stage of the inquiry, " 'invidious discriminatory purpose may often be inferred from the totality of the relevant facts . . . .' " Id., quoting *Washington* v. *Davis,* 426 U.S. 229, 242, 96 S. Ct. 2040, 48 L. Ed. 2d 597 (1976).

Our Supreme Court, however, has discussed some of the types of evidence that might help unmask pretext. These include whether the prosecutor's reasons are related to the case or are based on a group bias inapplicable to the prospective juror; whether the prosecutor questioned the juror, did so only perfunctorily, or asked questions not asked of other jurors so as to elicit a particular response; whether jurors of different races but similar characteristics were treated differently; and whether a disproportionate number of peremptory challenges were used to strike from the veniremembers of one particular race. *State* v. *Smith,* supra; *State* v. *Gonzalez,* supra, 399.

Because the court has recognized that these examples "are by no means exhaustive"; *State* v. *Gonzalez,* supra; other factors may be considered in evaluating whether peremptory challenges have been used in a discriminatory manner. *Ex Parte Branch,* 526 So. 2d 609, 625 (Ala. 1987). One such factor is whether there has been disparate treatment of veniremembers who answer a question in the same or similar manner. Id., 623; *Slappy* v. *State,* 503 So. 2d 350, 352 (Fla. App. 1987). Although this criteria has been applied in situations involving members of different races, it is no less applicable when multiple minority veniremembers who are challenged give the same or very similar answers to the same inquiry, and only some are challenged on the basis of their responses. Selective and inconsistent reasoning in the use of peremptory challenges against members of the same race or ethnic background, in my view, can raise an inference of purposeful discrimination. A prosecutor's questions and statements during voir dire also can be indicative of pretext; *Batson* v. *Kentucky,* supra, 96–97; *State* v. *Holloway,* supra, 642; especially when the voir dire lacks any meaningful questions designed to ascertain whether the prosecutor's assumptions about the veniremember are correct. See *Lewis* v. *State,* 775 S.W.2d 13, 15 (Tex. App. 1989).

Similarly, an inference of purposeful discrimination is raised when the prosecutor uses all or most of his peremptory challenges to remove blacks; *Batson* v. *Kentucky,* supra, 93; *Ex Parte Branch,* supra; or when peremptory challenges are used to dismiss all or most of the black veniremembers. Id.; *People* v. *Turner,* 42 Cal. 3d 711, 724–26, 726 P.2d 102, 230 Cal. Rptr. 656 (1986); *Slappy* v. *State,* supra, 354. Statistical analysis of the percentage of the minority membership on the sworn jury as compared with the percentage of minority members in the jury pool also can be indica-

tive of pretextual explanations for peremptory challenges. See *United States* v. *Peete,* 919 F.2d 1168, 1179 (6th Cir. 1990); *United States* v. *Sangineto-Miranda,* 859 F.2d 1501, 1521–22 (6th Cir. 1988). Finally, the most basic element in any determination of whether there was purposeful discrimination is the voir dire proceedings themselves. "Frequently, the most probative evidence of intent will be objective evidence of what actually happened . . . ." *Washington* v. *Davis,* supra, 253 (Stevens, J., concurring). It is against this precedential backdrop that we now turn to the prosecutor's peremptory challenges of the black veniremembers.

## D

### PROSECUTOR'S USE OF PEREMPTORY CHALLENGES

### 1

### Veniremember Simmons

At trial, the prosecutor used his first peremptory challenge to strike Marion Simmons, a black woman who was the third veniremember to appear for voir dire. When questioned by the defendant, Simmons stated that she had been the victim of a crime four years earlier. A man, who was never apprehended, stole her pocketbook or other personal belongings near the train station in downtown New Haven. Had the police responded faster, Simmons said, they could have apprehended the perpetrator. She said her feelings would not affect her evaluation of the police officers' testimony.

Under questioning by the prosecutor, Simmons stated that she had seven brothers and sisters with whom she stayed in contact "[s]ometimes. We try to stay in touch." She said a younger brother had been in trouble with the law in New Haven about three years earlier, although she was unsure what charges he may

have faced. She said he had sold drugs and had been a substance abuser, but that he was now employed in the Job Corps in Boston. Simmons also stated that she knew other people who use drugs and alcohol. When asked if she thought those accused of narcotics crimes should be vigorously prosecuted, she said: "Well, in my opinion, I feel if it's going to help the person—if this person is going to be put in a situation where they're going to rehabilitate themselves, but not if they're not going to keep . . . going in and out of the court system. They're going to be charged and then they're going to be back here and charged and back here again. Then in my opinion, I don't think it's helping the situation at all. And to my brother that—the one that's in Boston now . . . he was a—I think he sold drugs before and he was a substance abuser, but it shows a change can be made. So you know, you really can't— I—I really can't base it on that." Simmons then reiterated that her dissatisfaction over the police response would not affect her evaluation of police testimony. She further stated that she could return a guilty verdict if the state proved its case and she thought the defendant would be incarcerated rather than rehabilitated.[17] The prosecutor then exercised his first peremptory challenge to excuse her.

---

[17] After the prosecutor concluded his voir dire, the following exchange occurred between the court and Simmons:

"The Court: I have one question. Just to clarify one point. . . . See if you agree on this. I think if people were asked what's the most desirable result of a court case, I think we would all agree rehabilitation, right?

"Ms. Simmons: Right.

"The Court: Okay. If you thought that a—if you had thought along the lines, 'Well, gee, this Judge O'Keefe, he looks mean. He might not be interested in rehabilitation. I'm afraid he's going to just lock someone up.' Would you let the thought of the consequences of a verdict prevent you from doing what the evidence dictated. You see what I mean? If the case was proven beyond a reasonable doubt—

"Ms. Simmons: Hm, hm.

"The Court: Would you . . . hesitate to convict him because you were worried about what . . . I might do or some other judge might do to him?

## 2

### Veniremembers Murphy and Connor

The second black veniremember was Warren Murphy, the eighth member of the venire to be questioned. When the defendant asked if Murphy had any strong personal opinions about drug use, he responded, "No, not really. I figure an individual is going to do what he's going to do so, you know, I keep to myself, really." When the court stated, "Meaning someone else's business is their business," Murphy replied, "Yes. Yes." Shortly thereafter, the defendant asked Murphy if he is "the kind of person that would stand by [his] own opinion even if [he was] in the minority" during jury deliberations. Murphy replied, "Yeah, quite."

During voir dire by the prosecutor, Murphy disclosed that his brother was a deputy sheriff, and his stepfather was a retired police officer who had advised him to stay out of trouble. When asked about his views on drug use, Murphy replied, "[Y]ou can't tell [people] what to do because they're going to do what they want, you know, regardless. So, I just kind of mind my business and keep to myself, you know." He also stated his belief that people should be arrested and vigorously prosecuted for drug offenses, and punished if found guilty.

---

"Ms. Simmons: No, because that's what we're here to—
"The Court: Okay.
"Ms. Simmons: To put all the chips on the table.
"The Court: Okay.
"Ms. Simmons: To find out all the evidence, and if all the evidence proves beyond a reasonable doubt, then that's what we're here to do.

\* \* \*

"The Court: Any problem with the last clarification?
"[Public Defender]: No.
"[The State]: No.
"The Court: Okay, thank you.
"[Public Defender]: Accepted.
"[The State]: Excused."'

When inquiring about the state's burden of proof, the prosecutor asked Murphy several lengthy and complex questions about whether he would hold the state to proving guilt "beyond all doubt" or "beyond a shadow of a doubt." When Murphy replied affirmatively, the court cautioned the prosecutor about the use of these terms and advised that he define them. The prosecutor then told Murphy that proof beyond a reasonable doubt "does not mean beyond all doubt," and that "you can actually find someone guilty if you're not absolutely certain that they're guilty." This prompted the court to tell the prosecutor, "You're on a slippery slope there, counselor." Shortly thereafter, the prosecutor twice more asked Murphy if the state should have to prove guilt beyond a shadow of a doubt or beyond all doubt. The court then interjected and explained to Murphy in layman's terms the concept of proof beyond a reasonable doubt, after which Murphy twice stated that he would apply that standard of proof.[18]

---

[18] The following exchange occurred:

"The Court: To obtain a conviction, the evidence has to prove [the defendant] guilty beyond a reasonable doubt. Everyone seems to agree that that is less than proving something to an absolute certainty. . . . If I defined proof beyond a reasonable doubt for you in terms which were designed for jurors, would you accept that standard?

"Mr. Murphy: Oh, yeah.

"The Court: All right. Now what this gentleman is worried about, because things are so hard to prove to a certainty and positively, is that you might use your own separate standard. Would you do that?

"Mr. Murphy: It would all depend on what it is, you know, like I don't know, I can't really explain because I don't know the whole case.

"The Court: All right. Let me go back again. We both agree that this is a very serious matter for you and for everyone else involved, especially the defendant. You don't want to make a mistake, do you?

"Mr. Murphy: No. See, that's the thing.

"The Court: All right. The safest thing along those lines to ensure that is to be as certain as you can.

"Mr. Murphy: Hm. Hm.

"The Court: The state does not have to prove this gentleman guilty posi-

After the prosecutor used his second peremptory challenge to strike Murphy, the court granted the defendant's request for explanations as to why Murphy and Simmons were stricken. The prosecutor stated that Murphy had a problem understanding the state's burden of proof, and that because his attitude toward drug use was that "it's somebody else's business or somebody else's problem," he would not be inclined "to take an active stand" in jury deliberations since he is "kind of a loner [who] would stay out of it."

Regarding Simmons, the prosecutor expressed concern about how she would evaluate police testimony and her attitude toward drug offenses. He focused on her feelings about the failure of the police to respond more quickly when she was robbed, stating that Simmons had "said something to the effect that she could have been treated a little bit more justly." The prosecutor also stated that Simmons' statements about rehabilitating criminals reflected a perception that the judicial system is merely "a revolving door." Further, he characterized her attitude toward drug crimes as "a bit cavalier" and noted that when he asked about her brother, who he believed had been arrested a few years earlier by the New Haven police,[19] he was bothered that Simmons "didn't really display any overt concern" about drug abuse.

In its ruling, the court declined to find that the peremptory challenges against Simmons and Murphy were based on purposeful racial discrimination. The court stated that "neither one of [them] on the face of

tively. Or to a 100 percent certainty. But only beyond a reasonable doubt.
"Mr. Murphy: I understand.
"The Court: Will you use that standard and not some higher standard of your own if you sit on this jury?
"Mr. Murphy: No, I'll use that standard."

[19] Although the prosecutor said he believed the brother had been arrested, Simmons said only that he had been "in trouble with the law" and that she was unsure what charges may have been lodged.

it were unacceptable, but that's not the test, my own personal opinion is not the test here. The test involves the credibility of [the prosecutor]." The court also stated that "my findings with regard to these two jurors are subject to review . . . possibly throughout the case. And let me say that although I find nonracial reasons for the excusal of these two jurors . . . I think it's a very close call, a rather extremely close call. . . . If I see a pattern here, the panel is going to be dismissed, or [the defendant] is going to be granted additional challenges here or some other appropriate action."

Shortly thereafter, the tenth person to appear for questioning was Thomas Connor, the third black veniremember. When presented by the defendant and the court with examples involving application of the beyond a reasonable doubt standard, Connor exhibited hesitancy and confusion. Regarding drugs, he testified that he knew people who had been involved with them, adding, "I let them live their own life. . . . I let them go their own way." He stated that while he does not want to be involved with people who sell drugs, he does not try to avoid all contact with them "[b]ecause if you did that, you might as well stay in the house because everywhere you go, you got people that do it." Connor also testified that despite the ubiquitous nature of drug abuse, narcotics trafficking is wrong and those engaged in it should be incarcerated. After using his third peremptory challenge to strike Connor, the prosecutor explained that Connor "had a cavalier attitude towards the drug problem." The court then ruled that Connor had been stricken on the basis of race.[20]

---

[20] When the prosecutor struck Connor, the court asked for an explanation:
"The Court: Let's hear the reasons.
"[The State]: Judge, I was very concerned—I wasn't concerned up to the point where Mr. Ullman first asked him about the drug problem, then he

## 3

### Review of Prosecutor's Reasons for Challenging Veniremember Simmons

Although the prosecutor felt Simmons might be unable to evaluate fairly police testimony, his reasons were speculative and unconvincing, thus permitting an inference of pretext. The prosecutor explained that when he asked about narcotics offenses, Simmons "didn't really display any overt concern." A veniremember's failure to react emotionally to voir dire questions, however, is not a reasonably clear and specific explanation for striking her from the jury. *Floyd* v. *State,* 511 So. 2d 762, 764 (Fla. App. 1987).

Similarly, the prosecutor's questions and statements during voir dire were brief and perfunctory. *State* v.

---

said, I let them live their own life. . . . I had a little problem with that. And that's why I explored it to the extent I did, and that was my concern on this juror.

"The Court: It's a common feeling amongst society, especially with the violence that's associated with narcotics trade, people don't want to get involved, and that's exactly the sentiment that he expressed. That is not the reason for excusing him, this juror.

\* \* \*

"[The State]: . . . I thought he had a cavalier attitude towards the drug problem . . . it was kind of like, let them live their own life. I don't think that that is a healthy attitude for a juror . . . .

"The Court: Just so the record is clear, there were follow up questions by me and by counsel on that particular point, for purposes of clarification. He answered those questions perfectly. Any other reasons?

"[The State]: That was my chief concern with this individual."

During further colloquy with counsel, the court stated, "I could not come to the conclusion that your excusal of the last juror was for nonracial reasons. It was very thin, and it follows the [excusal] of two jurors who seemed to be perfectly acceptable and this was the third. A working man of two jobs, no contact with the police, he answered all the questions quite acceptable in my experience. . . . I not only did not see the reasoning but did not find [that there was] . . . [a] valid reason for you to exercise the peremptory challenge."

*Gonzalez,* supra, 398. They lacked any meaningful inquiry designed to ascertain whether his assumptions about her were correct. See *Lewis* v. *State,* supra. Mere intuitive judgment or suspicion by a prosecutor is insufficient to rebut a presumption of discrimination. *State* v. *Gonzalez,* supra. When the prosecutor's reasons are not supported by the voir dire record, they may be seen as speculation. *Williams* v. *State,* 548 So. 2d 501, 506 (Ala. Crim. App. 1988). In this case, the failure of the voir dire testimony to support the prosecutor's assumptions about an alleged lack of concern over drug offenses is evidence pointing toward a finding that his proffered explanation constitutes a cloak for racial discrimination.

With respect to Simmons' brief encounter with the New Haven police four years earlier, while it might be true that prosecutors commonly seek to avoid seating jurors who have had negative experiences with the police; *State* v. *Smith,* supra, 14; this does not translate into a carte blanche right to strike jurors based on *any* kind of unpleasant experience with the authorities. In *Smith,* where the prospective juror had an arrest record, our Supreme Court upheld the peremptory challenge. Id., 14–15. In this case, however, Simmons not only had no arrest record, but she had been the victim of a crime herself.

Contrary to the state's claims, it is more plausible to believe that she might have been sympathetic to the state as a result of her experience, since the state was the party seeking to combat the spread of drugs so as to prevent the victimization of innocent people such as Simmons. See, e.g., *McCray* v. *Abrams,* 750 F.2d 1113, 1133 (2d Cir. 1984), vacated and remanded, 478 U.S. 1001, 106 S. Ct. 3289, 92 L. Ed. 2d 705 (1986) (being a crime victim is "an experience that one might think would make [a veniremember] identify more with a complaining witness than with a defendant"). More-

over, during voir dire, Simmons told both the defendant and the prosecutor in no uncertain terms that her experience with the authorities would not affect her ability fairly to evaluate police testimony. Given that nothing to the contrary exists in Simmons' voir dire testimony, the prosecutor's concern about her experience with the police constitutes speculation and thus further indicia of pretext.

Similarly, the record also fails to support the prosecutor's explanation relating to the legal entanglements of Simmons' brother. Although federal courts have found that a prosecutor does not engage in purposeful discrimination when he peremptorily strikes a veniremember whose relative has been incarcerated; see, e.g., *United States* v. *Johnson,* 941 F.2d 1102, 1110 (10th Cir. 1991); *United States* v. *Jackson,* 914 F.2d 1050, 1052 (8th Cir. 1990); or who is "in trouble with the law" at the time of voir dire; *United States* v. *Forbes,* 816 F.2d 1006, 1009–10 (5th Cir. 1987); the situation here is quite different.

Contrary to the prosecutor's belief, no evidence existed that Simmons' brother had been arrested or incarcerated. Simmons only said that he had been "in trouble with the law" and that she was "not really sure" what charges he may have faced. She also said that she was not extremely close to her siblings, with whom she stayed in contact only "sometimes." Moreover, Simmons said her brother's troubles occurred *three years ago,* that he no longer uses drugs and that he now is in the Job Corps in Boston. Given the changed circumstances and the fact that her brother's difficulties occurred long before Simmons' voir dire, the prosecutor's concern about her brother also amounts to no more than speculation wholly unsupported by the record.

Finally, I fail completely to see what connection the prosecutor divined between Simmons' statement about the rehabilitation of criminals and the possible lack of fitness to serve as a juror at the defendant's trial. Rehabilitation and reformation of criminals have long been recognized goals of the penological system. See *Williams* v. *New York,* 337 U.S. 241, 248, 69 S. Ct. 1079, 93 L. Ed 1337 (1949); *State* v. *Corchado,* 200 Conn. 453, 463, 512 A.2d 183 (1986). Simmons' voir dire testimony indicated no more than an awareness of the rampant recidivism among convicted criminals and the profound difficulties it poses for the criminal justice system and society at large. Just as the mere fact that a prospective juror's residence in a high crime area does not necessarily mean the juror will be less interested in law enforcement; *Lynn* v. *Alabama,* 493 U.S. 945, 947, 110 S. Ct. 351, 107 L. Ed. 2d 338 (1989) (Marshall, J., dissenting from the denial of certiorari); *United States* v. *Bishop,* supra; *Williams* v. *State,* supra, 506; it also does not necessarily follow that one who exhibits awareness of the need to rehabilitate criminals has a "cavalier" attitude about drug offenses and thus will be unable fairly to determine the guilt or innocence of one accused of such an offense. Indeed, unless "a defendant is . . . serving a criminal sentence there is no rehabilitation process" with which to be concerned. *State* v. *Harris,* 14 Conn. App. 244, 249, 540 A.2d 395 (1988). Here, the prosecutor failed to demonstrate any nexus between Simmons' views about rehabilitation and her possible approach to the defendant's trial.

In my view, Simmons' responses reflect the kind of fair minded, intelligent, introspective thinking any attorney would want devoted to the merits of a case. Nothing in the record indicates she was incapable of impartially evaluating the testimony of police officers and, if warranted, returning a verdict of guilty. Because

the prosecutor's explanation for challenging her is unsupported by the "objective evidence of what actually happened"; *Washington* v. *Davis,* supra, 253 (Stevens, J., concurring); I would find that his reasons were insufficient, based on mere intuition and speculation, and thus a pretext for purposeful racial discrimination as a matter of law.

4

Review of Prosecutor's Reasons for Challenging<br>Veniremember Murphy

The prosecutor's reasons for excluding veniremember Murphy are no less tainted. The prosecutor expressed concern about Murphy's understanding of the state's burden of proof and claimed he would be unlikely "to take an active stand" in jury deliberations.

It is unquestioned that a prosecutor has a legitimate interest in seating jurors who will adhere to the governing burden of proof. *State* v. *Smith,* 222 Conn. 1, 12, 608 A.2d 63 (1992); *State* v. *Gonzalez,* supra, 404–405. In both *Smith* and *Gonzalez,* peremptory challenges were deemed proper because the veniremembers were indecisive or equivocal in their commitment to applying the proper standard of proof. See *State* v. *Smith,* supra; *State* v. *Gonzalez,* supra, 404; see also *State* v. *Tappin,* 20 Conn. App. 241, 249, 566 A.2d 709 (1989) (peremptory challenge proper in part because veniremember equivocated about whether drug use was a societal problem). In *State* v. *Smith,* supra, 12, for example, the veniremember said regarding the state's burden of proof, " 'I think I am understanding that. I am trying to.' " After the prosecutor explained the concept for the third time, the veniremember responded, " 'I am not sure I understand.' " Id. The Supreme Court found that a peremptory strike against the prospective juror was proper because she

"expressed equivocation about the applicable quantum of proof, *even after receiving further clarification of that standard.*" (Emphasis added.) Id.

Here, no such equivocation occurred. Unlike the veniremember in *Smith*, Murphy readily stated that he would apply the proper standard after hearing it explained in language comprehensible to a layman. He did so first when the defendant explained clearly and concisely the proper burden of proof in simple layman's terms. He was again firm in his commitment to applying the proper measure of proof when the court itself explained and clarified the standard in layman's language.

The record clearly shows that any misunderstanding on Murphy's part stemmed from the differing, unexplained terms and standards contained in the prosecutor's often lengthy and complex questions about the proper burden of proof. Twice, the court cautioned the prosecutor about the content of his inquiries. After the prosecutor asked if Murphy would expect the state to "prove guilt beyond all doubt, beyond a shadow of a doubt," the court stated, "I don't know where we're going with that question because none of those terms are defined. I mean, you throw in there that it might be a higher burden, but you've got to expand on that." Shortly thereafter, the prosecutor told Murphy that guilty beyond a reasonable doubt means that "you can actually find someone guilty if you're not absolutely certain that they're guilty." This prompted the court to state, "You're on a slippery slope there, counselor."

A prosecutor who confuses a veniremember with complex questions involving legal concepts should not be heard to complain about the prospective juror's lack of understanding. "[J]urors are not necessarily experts in English usage. Called as they are from all walks of life, many may be uncertain as to the meaning of terms

which are relatively easily understood by lawyers and judges." *McDonough Power Equipment, Inc.* v. *Greenwood,* 464 U.S. 548, 555, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984). After scrupulous review of the voir dire transcript, I find no support for the prosecutor's explanation that Murphy was unable to understand the state's burden of proof.

Similarly, the record does not support the prosecution's explanation that Murphy would be disinclined to participate actively in jury deliberations because of an allegedly laissez faire attitude toward drug abuse. Murphy clearly and unequivocally stated his belief that drug offenses should be vigorously prosecuted. He forcefully declared that he would voice his opinion in deliberations and stand by it even if he were in the minority. Further, Murphy disclosed that he had relatives and a friend who were involved in law enforcement, and that he had been advised to stay out of trouble with the authorities. Ordinarily, veniremembers with law enforcement ties in their backgrounds are more preferable as jurors to the state than they are to defendants. See *State* v. *Radi,* 578 P.2d 1169, 1175 (Mont. 1978) (noting "the natural inclinations of [a prospective juror] whose life is committed to law enforcement"); *State* v. *Reynolds,* 124 N.J. 559, 565, 592 A.2d 194 (1991) (criminal defendants unlikely to want member of law enforcement community on jury). Although this is not necessarily true, in combination with Murphy's direct and forceful answers, it serves to undercut the prosecutor's explanation and points toward pretext.

In light of Murphy's testimony, it was pretextual for the prosecutor to strike him based on speculation that he is "kind of . . . a loner" who would not "take an active stand" in jury deliberations and enforce the law because of his personal reluctance to intervene in the daily course of human events. Although Murphy's atti-

tude, like that of Camus' Meursault,[21] is one of detached indifference toward those whose daily behavior he sees as beyond his power to influence, it does not necessarily follow that unfitness to serve as a juror results merely because one views certain aspects of human behavior as intractable or not easily susceptible to change. "[N]o juror enters into his temporary judicial service stripped of his background and emotions." *Commonwealth* v. *Mutina,* 366 Mass. 810, 819, 323 N.E.2d 294 (1975). Indeed, a person's desire *not* to get involved in the sordid or illegal affairs of his fellow citizens is every bit as much his prerogative as it is to engage their attentions. Not every man wants to be his brother's keeper.[22] Although the trial court recognized this when the prosecutor attempted to strike Connor,[23] it failed to perceive this when Murphy was stricken.

Seen in this light, the prosecutor's reasons for striking Murphy are generic, group based presuppositions applicable in all criminal trials to those who encounter crime and drug trafficking where they work or live. By implicitly equating a person's encounters with crime and drug use with his acceptance of these activities, such reasons amount to little more than an assumption that one who chooses to mind his own business does so because he is anesthetized to the surrounding chaos and thus could not fairly try a black defendant accused of such crimes. See *United States* v. *Bishop,* supra, 825 (striking of black resident of poor, violent community because she may be " 'anesthetized to such violence' " amounts to mere assumption when residence not linked to specific facts of defendant's trial). What matters, however, is not *whether* Murphy possesses such an attitude, but *how*, if at all, it affects his ability to judge fairly the merits of the defendant's trial. Because the

---

[21] See A. Camus, The Stranger (1942).

[22] See Genesis 4:09.

[23] See footnote 19, supra.

prosecutor failed to establish this critical link, his reasons are surrogates for racial discrimination and thus run afoul of equal protection guarantees.

Moreover, the prosecutor's challenge against Murphy strikes at the very heart of what it means to be tried by an impartial jury. In discussing the sixth amendment requirement that juries be selected from a fair cross section of the community, the Supreme Court of California stated that this mandate is necessary "to achieve an overall impartiality by allowing the interaction of the diverse beliefs and values the jurors bring from their group experiences. Manifestly if jurors are struck simply because they may hold those very beliefs, such interaction becomes impossible and the jury will be dominated by the conscious or unconscious prejudices of the majority." *People* v. *Wheeler,* 22 Cal. 3d 258, 276, 583 P.2d 748, 148 Cal. Rptr. 890 (1978); see *Peters* v. *Kiff,* 407 U.S. 493, 503–504, 92 S. Ct. 2163, 33 L. Ed. 2d 83 (1972);[24] *State* v. *Tillman,* 220 Conn. 487, 510, 600 A.2d 738 (1991) (*Berdon, J.,* dissenting) (purpose of a jury is to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge). Whether Murphy's views are his own or representative of the many who must live in close daily proximity to the increasingly violent world of drug use, they are not grounds to exclude him from jury service when a prosecutor's reasons amount to no more than intuition. In today's world, where crime and illicit drugs have become so

---

[24] In *Peters* v. *Kiff,* 407 U.S. 493, 503–504, 925 S. Ct. 216, 33 L. Ed. 2d 83 (1972), Justice Marshall stated, "[W]hen any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable . . . its exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented."

much a part of urban life, the average citizen may indeed feel overwhelmed and acutely concerned with avoiding them in the interest of self-protection. To exclude blacks from jury service on this basis would be to ensure virtually that few, if any, blacks could serve at all.

Further indicia of pretext lie in the inconsistent and contradictory nature of the prosecutor's explanations. Both Murphy and Connor expressed a "live and let live" attitude toward those they encounter who are involved with drugs. Yet in challenging only Connor did the prosecutor perceive the presence of a "cavalier attitude towards the drug problem." Similarly, both Murphy and Connor initially exhibited some confusion about the legal concept of proof beyond a reasonable doubt. Although both said they would be able to apply the standard after hearing the court explain it, the prosecutor was troubled by only Murphy's response. Such disparate treatment of veniremembers who give the same or similar answers to the same question undercuts the legitimacy of the prosecutor's reasons and signals that they are pretextual. *Ex Parte Branch,* supra, 623; *Slappy* v. *State,* supra, 352.

The pattern of peremptory strikes against blacks also raises an inference of pretext. *United States* v. *Tindle,* 860 F.2d 125, 128 (4th Cir. 1988); *State* v. *Holloway,* supra, 642. Here, the prosecutor's challenges against every black in the first day's venire created a pattern of strikes that resulted in a disparate impact on the members of one race; *Hernandez* v. *New York,* supra, 1868; *State* v. *Gonzalez,* supra, 399; thus providing further salient evidence that his explanations were pretextual. *Ex Parte Branch,* supra; *People* v. *Turner,* supra; *Slappy* v. *State,* supra, 354. This comports with the results of a comparison of the percentage of blacks on the jury with that in the venire pool. When the percentage of minority members in the final sworn jury

is significantly less than the percentage in the venire from which they were chosen, an inference of discrimination is warranted. *United States* v. *Peete,* supra; *United States* v. *Sangineto-Miranda,* supra, 1521–22. Here, of the sixty members of the four venire panels, five, or 8.3 percent, were black.[25] Discounting Connor, the black veniremember whom the court seated, there were no blacks on the sworn jury—zero percent. An inference of discrimination is warranted.[26]

Finally, although a *Batson* inquiry focuses on the credibility of the prosecutor; *Batson* v. *Kentucky,* supra, 98 n.21; and not on the personal opinions of the trial court, credence may be given to the court's remarks in determining if peremptory challenges were improperly employed. See *United States* v. *Johnson,* 941 F.2d 1102, 1109 (10th Cir. 1991); *State* v. *Gonzalez,* supra, 405. Although the court here noted that the prosecutor's challenges against Simmons and Murphy represented "a very close call, a rather extremely close call," I find it quite telling that on at least four occasions the court remarked that Simmons and Murphy "seemed to be perfectly acceptable" and that "they were well qualified to be jurors."[27] Cf. *State* v. *Gonzalez,* supra (court's observation that voir dire yielded troubling responses given consideration on review in deciding if prosecutor had stated neutral reason for peremptory

---

[25] If the two Hispanics are included, the percentage of minorities in the venire is 14.3 percent.

[26] It should be emphasized that the results of the statistical analysis here, while relevant, are accorded no undue weight in the factual inquiry *Batson* and *Holloway* require. *Batson* v. *Kentucky,* 476 U.S. 79, 95, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986); *State* v. *Holloway,* 209 Conn. 636, 646, 553 A.2d 166 (1989). Such analysis can be relevant in ferreting out racial discrimination. See, e.g., *Castaneda* v. *Partida,* 430 U.S. 482, 496 n.17, 97 S. Ct. 1272, 51 L. Ed. 2d 498 (1977) (analysis of equal protection challenge to grand jury array); *State* v. *Castonguay,* 194 Conn. 416, 426–30, 481 A.2d 56 (1984) (analysis of whether grand jury contained fair cross section of community).

[27] The court also told the prosecutor, "I did not agree with your reasoning, and you're fortunate that that is not the test. In addition, *Gonzalez*

challenge). Further, the court itself questioned Simmons and Murphy, and found their answers to be satisfactory. It also noted, in disallowing the challenge against Connor, that the prosecutor had indicated he would accept two white males who appeared to have substantially more reasons for being excused than did the three blacks.

After exhaustive review of the record in this case, the totality of the direct and circumstantial evidence available leaves me "with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Hernandez* v. *New York, supra,* 1871, quoting *United States* v. *United States Gypsum Co.,* 333 U.S. 364, 395, 68 S. Ct. 525, 92 L. Ed. 2d 746 (1948). I would find that the reasons for striking Simmons and Murphy were pretextual as a matter of law, and that the trial court's ultimate factual ruling that the prosecutor did not act with forbidden racial animus was clearly erroneous.

## III

### REMEDY FOR IMPROPER USE OF PEREMPTORY CHALLENGES

Having determined that the prosecutor engaged in purposeful discrimination in striking Simmons and Murphy, the remaining question is whether seating Connor and granting the defendant four additional peremptory challenges was an appropriate remedy. The defendant claims it was not and argues that the court instead should have seated Simmons and Murphy, in

---

says reliance on intuitive judgment or an affirmation of good faith is insufficient. And that—you know that is just about what you did.

"I [have] had over one hundred jury trials and picked another hundred that never went to trial. I'm experienced in this matter. And in my mind, those were jurors for the state, except for the fact that they were black. . . ."

addition to Connor, and resumed the selection process. Under the circumstances of this case, however, I find neither approach proper.

After disallowing the challenge to Connor, the court and the defendant engaged in colloquy about a remedy. The court first indicated that it would dismiss the single juror the parties had previously chosen and begin the process anew the next day with a fresh venire panel. The defendant, however, indicated that future venires might not contain any minorities. He asked for time to consider the matter and stated that he did not want Connor dismissed. The court then seated Connor, agreed not to dismiss the other juror and recessed the proceedings. The next day, the defendant asked that Simmons and Murphy be recalled and seated. The court declined to do so, citing the "one day, one jury" rule,[28] and instead granted the defendant four additional challenges.

The United States Supreme Court has stated that because the equal protection clause is central to the fourteenth amendment's ban on discriminatory conduct by the state; *Rose* v. *Mitchell,* 443 U.S. 545, 554–55, 99 S. Ct. 2993, 61 L. Ed. 2d 739 (1979); it is "the duty of the courts to apply the Equal Protection Clause with special vigor in the area of racial discrimination." Id., 575 n.1, (Stewart, J., concurring). The court has repeatedly and unequivocally made clear that courts are under nothing less than an affirmative duty to eradicate racial discrimination "root and branch"; *Green* v. *School Board of New Kent County,* 391 U.S. 430, 437–38, 88 S. Ct. 1689, 20 L. Ed. 2d 716 (1968); wherever it occurs. See, e.g., *Franks* v. *Bowman Transportation Co.,* 424

---

[28] The "one day, one jury" rule is a measure promulgated by the jury administrator concerning the duration of jury service. The rule permits the state's judicial districts to determine for themselves how long prospective jurors must serve. The rule was in effect in the judicial district of New Haven at the time of the defendant's trial.

U.S. 747, 770, 96 S. Ct. 1251, 47 L. Ed. 2d 444 (1975) (employment discrimination); *Keyes* v. *School District No. 1, Denver, Colorado,* 413 U.S. 189, 213, 93 S. Ct. 2686, 37 L. Ed. 2d 548 (1973) (public schools); *Carter* v. *Jury Commission of Greene County,* 396 U.S. 320, 340, 90 S. Ct. 518, 24 L. Ed. 2d 549 (1970) (jury selection); *Louisiana* v. *United States,* 380 U.S. 145, 154, 85 S. Ct. 817, 13 L. Ed. 2d 709 (1965) (voting rights). " 'Where racial discrimination is concerned, "the . . . court has not merely the power but the duty to [take action] which will so far as possible eliminate [it]." ' " *Franks* v. *Bowman Transportation Co.,* supra, quoting *Albemarle Paper Co.* v. *Moody,* 422 U.S. 405, 418, 95 S. Ct. 2362, 45 L. Ed. 2d 280 (1975).

This is especially important when the sixth amendment right to an impartial jury is at stake. See *Carter* v. *Jury Commission of Greene County,* supra; *State* v. *McCollum,* 261 Ga. 473, 477, 405 S.E.2d 688 (Benham, J., dissenting), rev'd and remanded, 505 U.S. , 112 S. Ct. 2348, 120 L. Ed. 2d 33 (1992) (a court has a "duty to defend and protect the integrity of the judicial process and, as a necessary part of it, the jury selection process"); E. McIntosh, "The Defense Counsel's Guide to Understanding and Challenging Racial Discriminatory Peremptory Challenges in Connecticut Under *Batson* v. *Kentucky,* " 11 U. Bridgeport L. Rev. 31, 47–48 (1990) (an appellate court has an "exclusive and venerable independent duty" to review a trial court's finding involving the right to an impartial jury).

Although the *Batson* court did not express any view about appropriate remedies, it made clear that racially motivated juror strikes must be eradicated in order to enforce the mandate of the equal protection clause and maintain public confidence in the fairness of the criminal justice system. *Batson* v. *Kentucky,* supra, 99. The Connecticut Supreme Court's view of an appropriate *Batson* remedy accords with this mandate. See *State*

v. *Gonzalez,* supra, 400 (if the defendant carries his burden of proof, "the trial court must then dismiss the jurors thus far selected and the remaining venire, and begin anew the jury selection process"). Although the court's statement was dictum, under the circumstances here, this remedy is appropriate in order to give effect to the mandate of *Batson.*[29]

Once it had determined that the prosecutor acted with racial animus in striking Connor, the court should have reviewed the strikes against Simmons and Murphy, as it had indicated it might, and found that they, too, were impermissible. At that point, the court should have "remedied on the spot" (internal quotation marks omitted); *United States* v. *Biaggi,* 909 F.2d 662, 679 (2d Cir. 1990); this "shameful practice of racial discrimination in the selection of juries"; *Batson* v. *Kentucky,* supra, 102 (Marshall, J., concurring); by dismissing Connor and the juror previously selected, as well as the entire remaining jury pool, and beginning the process anew. Nothing less was required because of the devastating harm caused not only to the defendant, but to the judicial system and the community at large.

---

[29] A split of authority exists as to whether a court, after finding a *Batson* violation, always must dismiss those jurors selected, along with the rest of the venire, and begin the process anew. Compare *Booker* v. *Jabe,* 775 F.2d 762, 773 (6th Cir. 1985), vacated and remanded, 478 U.S. 1001, 106 S. Ct. 3289, 92 L. Ed. 2d 705, reinstated on remand, 801 F.2d 871 (6th Cir. 1986) (per curiam), cert. denied, 479 U.S. 1046, 107 S. Ct. 910, 93 L. Ed. 2d 860 (1987); *McCray* v. *Abrams,* 750 F.2d 1113, 1132 (2d Cir. 1984), vacated and remanded, 478 U.S. 1001, 106 S. Ct. 3289, 92 L. Ed. 2d 705 (1986) (when prosecutor's explanation does not rebut prima facie case, court should declare mistrial and new jury should be selected from prospective jurors not previously associated with case); *People* v. *Wheeler,* 22 Cal. 3d 258, 282, 583 P.2d 748, 148 Cal. Rptr. 890 (1978); *Riley* v. *State,* 496 A.2d 997, 1013 (Del. 1985); *State* v. *Gilmore,* 103 N.J. 508, 539, 511 A.2d 1150 (1986); with *United States* v. *Forbes,* 816 F.2d 1006, 1011 (5th Cir. 1987) ("prosecutorial misconduct is easily remedied prior to commencement of trial simply by seating the wrongfully struck venireperson"); and *Jefferson* v. *State,* 595 So. 2d 38 (Fla. 1992) (holding that court has discretion to fashion appropriate remedy and need not always dismiss entire jury pool).

*McCray* v. *New York,* 461 U.S. 961, 968, 103 S. Ct. 2438, 77 L. Ed. 2d 1322 (1983) (Marshall, J., dissenting); see *Powers* v. *Ohio,* 499 U.S. , 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991).

Had Simmons and Murphy been seated and the selection process continued, the chance that they, along with Connor, might speculate about the circumstances surrounding their seating would have left open the possibility of the trial's being infected by the specter of racial bias. See A. Alschuler, "The Supreme Court and the Jury: Voir Dire, Peremptory Challenges, and the Review of Jury Verdicts," 56 U. Chi. L. Rev. 153, 177 n.98 (1989) ("[a]lthough neither the prosecutor's explanation for the prospective juror's exclusion nor the court's ruling that this explanation was inadequate might have occurred within the hearing of the juror, a person excluded from a jury and then restored might well infer the situation"). "The rationale behind striking the entire jury pool is to provide the complaining party with a proper venire and not one that has been partially or totally stripped of potential jurors through the use of discriminatory peremptory challenges." *Jefferson* v. *State,* 595 So. 2d 38, 40 (Fla. 1992). "[A]nything less than an impartial jury is the functional equivalent of no jury at all." *Miami* v. *Cornett,* 463 So. 2d 399, 402 (Fla. App. 1985); *People* v. *Wheeler,* supra, 266. Under the circumstances of this case, wiping the slate clean was the *only* measure that would ensure that the defendant's state and federal constitutional rights to an impartial jury would not be compromised[30] and,

---

[30] It also should be remembered that the defendant requested the court to delay its decision until the next day, when the "one day, one jury" rule prevented the recall of Simmons and Murphy. Because I would find that the court failed to take appropriate action when Connor was stricken, the issue of whether reversal is required when a party induces error of constitutional proportion need not be addressed. See *State* v. *Murdick,* 23 Conn. App. 692, 702, 583 A.2d 1318, cert. denied, 217 Conn. 809, 585 A.2d 1233 (1991).

at the same time, give effect to the affirmative duty our courts are under to eradicate the scourge of racial discrimination.

This conclusion is mandated as well by other vitally important concerns that go to the heart of our democratic system of government. In condemning racial discrimination in the jury selection process, the United States Supreme Court has highlighted not only the harm done to the accused, but also the harm done to the individual juror and to society as well. In determining recently that citizens have a constitutional right not to be racially discriminated against in the jury selection process; *Powers* v. *Ohio,* supra, 1370; the court stated that along with voting, jury service affords ordinary citizens "their most significant opportunity to participate in the democratic process." Id., 1369. When a veniremember is excluded because of racial bias, "such exclusion produces 'injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts.' " *McCray* v. *New York,* supra, quoting *Ballard* v. *United States,* 329 U.S. 187, 195, 67 S. Ct. 261, 91 L. Ed. 181 (1946).

The right to serve on a jury invests ordinary citizens with a sense of empowerment derived from " 'a conscious duty of participation in the machinery of justice.' " *Powers* v. *Ohio,* supra, 1368, quoting *Balzac* v. *Porto Rico,* 258 U.S. 298, 310, 42 S. Ct. 343, 66 L. Ed. 627 (1922). It is not only a duty but " 'a privilege of citizenship.' " *State* v. *Tillman,* supra, 498 n.5, quoting *Thiel* v. *Southern Pacific Co.,* 328 U.S. 217, 224, 66 S. Ct. 984, 90 L. Ed. 2d 1181 (1946). Although jury duty is regarded by many today as a nuisance, it is imbued with a greater importance for those who have historically been shut out of decision making positions in the institutions that shape our society, and denied justice and equality before the law. This continued dis-

qualification is nothing less than one of the "badges and incidents" of second class citizenship, signifying the subordinate status African-Americans have endured for much of their history in this country. See generally, D. Colbert, "Challenging the Challenge: Thirteenth Amendment as a Prohibition Against the Racial Use of Peremptory Challenges," 76 Cornell L. Rev. 1, 12 n.39 (1990). Moreover, excluding prospective jurors based on race undermines the dignity of minority groups and carries with it the unspoken suggestion that they are in some way incapable of fulfilling their duties as citizens. See, e.g., L. Magid, "Challenges to Jury Composition: Purging the Sixth Amendment Analysis of Equal Protection Concepts," 24 San Diego L. Rev. 1081, 1101 (1987) ("excluded jurors are branded with a stamp of inferiority"). For black citizens to be "singled out and expressly denied . . . all right to participate in the administration of the law, as jurors, because of their color . . . is practically a brand upon them, affixed by the law, an assertion of their inferiority." *Strauder* v. *West Virginia,* 100 U.S. 303, 308, 25 L. Ed. 664 (1880). Indeed, it is nothing less than a stigma of dishonor and second class citizenship. *Powers* v. *Ohio,* supra, 1370.

Given the profound and far reaching effects of racial discrimination in the use of the peremptory challenge, it is important that our courts attempt to fashion remedies that both vindicate the accused's constitutional rights to an impartial jury and protect the public's interest in the integrity of the jury selection system, the very bedrock of our truth seeking process. The day is simply long gone when the peremptory challenge can be regarded as "an arbitrary and capricious species of challenge"; 4 W. Blackstone, Commentaries 353; to be employed for any reason or for no reason at all.[31] Such

---

[31] Blackstone said of the peremptory challenge that " '[i]n criminal cases . . . there is . . . allowed to the prisoner an arbitrary and capricious spe-

talismanic justifications for the avoidance of judicial oversight may have been acceptable in times when women, blacks and other minorities were unwelcome within the corridors of the legal system, but they are no longer valid in the pluralistic, race conscious society we inhabit today. For we must not forget that until only recently, our brothers and sisters of color did not even possess the right to sit on a jury in this state.[32] We must not forget, too, that since the beginning of slavery in this nation, it has been the specter of the all white jury that has signified the ultimate, impenetrable obstacle to justice for African-American criminal defendants. Since colonial days, when our forebears fought to free themselves from the grip of a foreign power, the right of "trial by juries *impartially selected*" has been among the "principles [that] form the bright constellation which has gone before us, and guided our steps through an age of revolution and reformation." (Emphasis added.) 3 Writings of Thomas Jefferson 322 (Mem. Ed. 1905). Racial bias in jury selection, this courtroom "vestige of slavery"; D. Colbert, supra, 6;

---

cies of challenge to a certain number of jurors, without showing any cause at all; which is called a peremptory challenge; a provision full of that tenderness and humanity to prisoners, for which our English laws are justly famous. This is grounded on two reasons: 1. As every one must be sensible, what sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another; and how necessary it is that a prisoner . . . should have a good opinion of his jury . . . the law wills not that he should be tried by any one man against whom he has conceived a prejudice even without being able to assign a reason for such dislike. 2. Because, upon challenges for cause shown, if the reason assigned prove insufficient to set aside the juror, perhaps the bare questioning his indifference may sometimes provoke a resentment; to prevent all ill consequences from which, the prisoner is still at liberty, if he pleases, peremptorily to set him aside.' " *Lewis* v. *United States,* 146 U.S. 370, 376, 13 S. Ct. 136, 36 L. Ed. 1011 (1892), quoting 4 W. Blackstone, Commentaries 353.

[32] Until 1870, when the fifteenth amendment to the federal constitution was adopted, the Connecticut constitution limited those who could serve on a jury to "white male citizens of the United States."

not only thwarts the exercise of that right, but "violates our Constitution and the laws enacted under it [and] is at war with our basic concepts of a democratic society and a representative government." *Smith* v. *Texas,* 311 U.S. 128, 130, 61 S. Ct. 164, 85 L. Ed. 84 (1940). "[I]n such a war the courts cannot be pacifists." *People* v. *Wheeler,* supra, 267.

Accordingly, I concur only in the court's judgment reversing the defendant's conviction.